UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CREDE CG III, LTD.,

                              *Plaintiff,*

                    - against -

22nd CENTURY GROUP, INC.

                              *Defendant.*

Index No.:

**COMPLAINT**

---

Plaintiff Crede CG III, Ltd. ("Crede"), by its undersigned counsel as and for its Complaint against Defendant 22nd Century Group, Inc. ("22nd Century") hereby alleges as follows:

## NATURE OF THE ACTION

1. This dispute arises out of defendant 22nd Century's breach of its contractual obligations to plaintiff Crede, its largest shareholder, and its wrongful interference with Crede's contractual relationship with a joint venture formed to pursue a lucrative supply contract in the People's Republic of China ("China") worth over $1 billion. Defendant's willful and malicious conduct has caused over $250 million in damages. To prevent further improper conduct, including 22nd Century's wrongful usurpation of the China supply contract, injunctive relief is urgently required.

## PARTIES

2. Plaintiff Crede CG III, Ltd. is a Bermuda company, which has its principal place of business in Los Angeles, California. Crede predominantly invests in "small cap" emerging companies. Crede has an exemplary track record of identifying companies with high-growth

1

potential and providing them with the capital needed to achieve their business objectives and create shareholder value.

3. Defendant 22nd Century, a Nevada Corporation with its principal place of business in Clarence, New York, is a plant biotechnology company that focuses on the research, development, licensing, manufacturing, and worldwide sales and distribution of genetically engineered tobacco products. 22nd Century's proprietary technology and plant breeding expertise allow it to regulate the levels of nicotine and nicotine alkaloids in the tobacco plant, thereby facilitating the growth of tobacco with reduced nicotine content. 22nd Century is publicly traded on the New York Stock Exchange under the ticker symbol "XXII".

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over Plaintiff's claims in this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship as between Plaintiff Crede and Defendant 22nd Century, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue is proper in this District pursuant to 28 U.S.C. §1391 (b) and (c) because Defendant resides, transacts business, is found, or has agents in this District, and because a substantial part of events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District. Venue is also proper in this District because certain contracts at issue in this action designate this District as the stipulated venue for adjudication of the parties' disputes.

## FACTUAL BACKGROUND

### A. Enticed by the Prospect of Tobacco Sales in China, Crede Invests in 22nd Century

6. In 2014, through its extensive contacts in China, Crede identified opportunities to offer specialized tobacco products to China National Tobacco Company ("CNTC"), through its subsidiary China Tobacco International ("China Tobacco"), the largest seller of tobacco worldwide with more than 50% of the global tobacco market. In June 2014, Crede's Principal, Terren Peizer, through his affiliates in Beijing, China, arranged for several critical meetings with key executives at CNTC to lay the groundwork for 22nd Century to obtain a valuable supply agreement with China Tobacco. The forecasts that Crede and 22nd Century prepared, based on information provided by CNTC, confirm the enormous value of such a supply relationship. By 2019, the parties anticipated over $1 billion in aggregate revenue, with over $400 million in profit from sales to China's Yunnan province alone (which represents 20% of China's tobacco market).

7. Crede and 22nd Century thereafter began negotiations over a structure under which Crede would provide 22nd Century with the resources it needed to pursue a deal with CNTC on terms that would fairly compensate Crede for its role. In September 2014, after extensive negotiation, the parties agreed on a structure for the venture. Crede's role was memorialized in a network of integrated contracts, drafted and negotiated in tandem, and executed in late September 2014. Under these agreements, in exchange for a $10 million investment, Crede received 22nd Century common stock. Crede also received a 25% interest in a

joint venture formed to provide product to CNTC as well as warrants in 22nd Century (collectively referred to herein as the "Finance Agreement").[1]

8. Crede's purchase of 22nd Century common stock was memorialized in a Securities Purchase Agreement, dated as of September 17, 2014 (the "SPA"). Pursuant to the SPA, Crede invested $10 million in exchange for a number of common shares based on the trading price for 22nd Century's common stock in the days preceding the effective date of the SPA. The SPA is governed by New York law and specifies New York County as the exclusive forum for resolving the parties' disputes. Simultaneously, Crede entered into a Side Letter Agreement, which ensured that Crede would receive a warrant for providing financing, if the China joint venture failed to close by October 14, 2016.

9. On September 29, 2014, Crede and 22nd Century executed the second leg of the deal, a joint venture agreement (to be funded with the $10 million delivered by Crede 12 days earlier) and a package of warrants.

10. On that date, Crede entered into a Shareholders Agreement (the "China JV Agreement"), along with 22nd Century, to form 22nd Century Asia, Ltd. ("22nd Century Asia" or "China JV") to govern the marketing and sale of 22nd Century's tobacco products in Greater China, including in Macau, Taiwan and other territories. The introductory clauses in the China JV Agreement summarized the business plan:

> WHEREAS, the Company (22nd Asia) was formed as part of a structure to market and sell tobacco produced by XXII (22nd Century) to China Tobacco International ("China Tobacco") or any of its Affiliates, an Affiliate of China National Tobacco Company ("CATC"), for use in the Province of Yunnan in the People's Republic of China;

---

[1] As set forth below, given Crede's knowledge and expertise in China, Crede and 22nd Century also entered into a consulting agreement during the same time period, pursuant to which Crede agreed to facilitate 22nd Century's entry into the Chinese tobacco market.

> WHEREAS, Crede, directly and through its Affiliates, is an investment firm with substantial experience and expertise doing business in the People's Republic of China and forming, financing and operating wholly foreign-owned enterprises in the People's Republic of China;
>
> \*   \*   \*
>
> WHEREAS, (22nd Asia) will establish a wholly foreign-owned enterprise in the People's Republic of China ("WFOE") to market and sell XXII's tobacco produced outside of the People's Republic of China to China Tobacco;
>
> WHEREAS, XXII will license to China Tobacco, on a non-exclusive basis, certain of XXII's intellectual property in order to secure a contract from China Tobacco;
>
> WHEREAS, XXII will contribute US $10.0 million to the Company on a preferred basis to be used as the WFOE's registered capital;

11. In light of Crede and Peizer's knowledge and expertise, the parties also entered into a Consulting Agreement, by which Crede would assist 22nd Century with facilitating the sale of its tobacco products to CNTC. The Consulting Agreement explicitly contemplated issuance of the Crede Warrants discussed below.

12. On September 29, 2014, Crede received a total of four separate classes or "tranches" of warrants denominated Tranche 1A, Tranche 1B, Tranche 2 and Tranche 3 (collectively, the "Crede Warrants") to purchase an aggregate 4.25 million shares of 22nd Century's common stock. Each tranche was issued on September 29, 2014, and is governed by a separate Warrant Agreement.

13. Each of the Crede Warrants was immediately exercisable upon issuance, at a pre-determined "Exercise Price," subject to adjustment. Each of the Warrant Agreements explicitly references the SPA. Like the SPA, each of the Warrant Agreements is governed by New York law and specifies New York County as the exclusive forum for resolving disputes.

14. The Tranche 1A Warrants contain a valuable exchange right under which Crede has the option to tender the Warrant, in whole or in part, and receive shares of common stock equal in value, based on then current market prices, to a contractual formula. That formula ascribes a value of the Tranche 1A Warrants being exercised (defined as the "Black-Scholes Exchange Value") and divides it by the trading price of 22nd Century common shares two days prior to the exchange date (defined as the "Exchange Price") to determine the number of common shares issued to Crede (defined as the "Exchange Number") upon its exercise of the Exchange Right (the "Exchange Right"). The Exchange Right exists independently, and in addition to, Crede's right to purchase common shares at the Exercise Price under the Tranche 1A Warrant Agreement.

15. The Exchange Right is fully exercisable at Crede's option at any time from 61 days after closing of the SPA until September 29, 2016. While the Tranche 1A Warrant restricts Crede's ability to participate in corporate governance, the Agreement explicitly provides that these activity restrictions "shall not limit [Crede's] rights to enforce its rights or exercise its rights as to the Securities or under this Warrant."

16. As of the filing of this Complaint, the Exchange Right had a value in excess of $2.4 million.

B. **The Parties Form the China Joint Venture and 22nd Century Takes Control**

17. The core motivation for Crede's investment in 22nd Century was the formation of a joint venture to pursue the marketing and sale of 22nd Century's tobacco, through a contract with China Tobacco, a subsidiary of CNTC.

18. The enormous value of this contract was acknowledged by 22nd Century repeatedly. Indeed, in a communication dated September 13, 2014, Joe Reda, a banker at Chardan Capital who was 22nd Century's agent on the private placement, sent an email to the

company's board of directors, emphasizing the importance the China venture held for Crede's investment, and the unitary nature of the financing, stating:

> [c]osmetically the pipe [SPA] will be quick and quiet and announced with 'no warrants' alongside a potential catalyst (very bullish to be fully funded with an announcement that will require capital) The 1.25mil crede warrant will be part of the jv, not the pipe (subject to a 'break up fee' if the "sending tobacco to china for testing" doesnt get announced.) If china does get announced in a week or 2, then the vesting schedule of the 4.25mil wrnts as currently drafted and negotiated will be in effect at that time.

19.    The Chinese tobacco market is the largest in the world, accounting for over 50% of the worldwide market, and growing as of 2014. Based on the parties' conservative estimates, aggregate revenue for the sale of 22nd Century tobacco to CNTC *in the Yunnan province alone* would exceed $1 billion by October 2019 with over $400 million in profit. The Agreement to sell in this one province opened the door to multiple supply contracts with CNTC subsidiaries throughout China. Defendant 22nd Century touted these forecasts, along with CNTC's readiness to place a $24 million order for samples of 22nd Century's tobacco. The order for samples alone exceeded cumulative revenue from all earlier sales by 22nd Century.

20.    Crede, and its principal, Terren Peizer, through his affiliates in Beijing, China, possessed significant experience conducting business in China and maintained valuable ties to the Chinese tobacco market, among other things, through relationships with senior officials at CNTC. Crede and Peizer at all times performed under the Consulting Agreement, ultimately introducing 22nd Century to Dennis Sun, a senior executive at CNTC, to orchestrate 22nd Century Asia closing a contract with CNTC or its subsidiary. Sun was designated by CNTC to oversee the project. The combination of Crede's $10 million capital commitment to 22nd Century, the knowledge and expertise of Crede's affiliates in China, and 22nd Century's unique tobacco products, presented excellent prospects for the success of the China joint venture.

21.     The marketing and distribution of 22nd Century's tobacco products in China was to be conducted through 22nd Century Asia. The parties' rights and obligations with respect to that venture were memorialized in the China JV Agreement (a Shareholders Agreement for 22nd Century Asia, by and between that entity, 22nd Century, Crede, and a third party, Champion Investments, Ltd. ("Champion"), dated as of September 29, 2014).

22.     The management and operation of the China JV was the responsibility of 22nd Century. 22nd Century possessed majority voting power as a result of its 51% ownership stake in the venture. The board of directors of the China JV was also controlled by 22nd Century, which appointed a majority of its five-person board. Crede was a minority interest holder in 22nd Century Asia, owning 20 Class B Shares and authorized to appoint one individual to 22nd Century Asia's board. It held a 25% interest in the equity of the venture.

23.     Critically, the China JV Agreement obligated 22nd Century and 22nd Century Asia to pursue the contract with China Tobacco in China in several respects. Among other things, 22nd Century Asia was obligated to:

- form a wholly-foreign owned enterprise ("WFOE") for purposes of conducting business in China, without which the parties would be unable to market and sell tobacco to China Tobacco;

- use "commercially reasonable, good faith efforts" to secure a long-term tobacco sales contract with China Tobacco or any entity controlled by it in China (referred to as an "Acceptable China Tobacco Contract.").[2]

---

[2]     If 22nd Century Asia was successful in doing so, both it and 22nd Century were obligated to use "commercially reasonable, good faith efforts" to negotiate a contract for the supply of 22nd Century's tobacco products to 22nd Century Asia for purposes of selling such products to China Tobacco (or any entity controlled by it).

24. The China JV Agreement also provided that 22nd Century Asia and its subsidiaries "shall be the exclusive entities through which [22nd Century] shall sell or otherwise distribute tobacco products for use in the People's Republic of China."

25. The China JV Agreement further imposed direct obligations on 22nd Century. In particular, the China JV Agreement contemplated that 22nd Century would send China Tobacco a sample of its specialty tobacco by on or around October 30, 2014 for evaluation. It was expected China Tobacco would base its ultimate decision to purchase 22nd Century Tobacco on that sample. CNTC ultimately received, and approved the sample, and indicated its firm willingness to proceed with a contract for the purchase of 22nd Century's tobacco products.

26. Defendant 22nd Century was also obligated to license certain of its intellectual property to China Tobacco for no less than $8.4 million. Upon payment of that license fee, and establishment of the WFOE, and a favorable evaluation of 22nd Century's tobacco, 22nd Century would then contribute $10 million to 22nd Century Asia. As reflected in communications between Crede, 22nd Century executives, and 22nd Century's banker prior to closing the SPA and Crede Warrants, it was understood and agreed between the parties that this payment was to come from Crede's investment of the same amount in 22nd Century.

27. 22nd Century's prospects for success were excellent. By late 2014, 22nd Century possessed, among other things, an attractive product, key connections with CNTC, sourced from Crede, and Crede's $10 million cash infusion to capitalize 22nd Century Asia. As a result of Defendant's wrongful conduct, however, 22nd Century Asia has been a total failure. As set forth below, 22nd Century intentionally prevented 22nd Century Asia from performing its basic obligations under the China JV Agreement. Defendant did so in order to terminate the China JV

Agreement, cut Crede out, and secretly pursue the CNTC opportunity for itself in gross violation of the China JV Agreement.

### C.   22nd Century Causes 22nd Century Asia to Breach the China JV Agreement

28.   Notwithstanding its clear contractual mandate, Defendant used its control over 22nd Century Asia to induce many breaches of the China JV Agreement. In particular, 22nd Century ensured that 22nd Century Asia flouted its obligation to use "commercially reasonable, good faith efforts" to secure a long-term tobacco sales contract with China Tobacco or any entity controlled by it in China. Defendant 22nd Century also ensured that 22nd Century Asia failed to perform rudimentary tasks necessary to obtain the contract.

29.   For example, formation of a WFOE in China was an absolute prerequisite to conducting business with CNTC. CNTC will not transact business with foreigners absent formation of such an entity that maintains a presence in China. The formation of a WFOE is also a largely administrative task. The process typically takes 60-90 days to complete.

30.   Approval requires a party to, among other things, finalize and file an application with the Chinese government, establish a bank account, and demonstrate adequate paid-in capital for the WFOE.

31.   The CNTC typically requires a $10 million capital commitment – which was to come from Crede's $10 million investment in 22nd Century. However, as 22nd Century's capital dwindled over time, Crede was able to secure a reduction of the paid-in capital requirement to $4 million through the efforts of its affiliates in China.

32.   Nevertheless, although 22nd Century began the process in the Spring of 2014, over one year later, it was still unable to form the WFOE.

33.   Defendant 22nd Century not only failed to form the WFOE but, by the admission of its own executives, also failed to complete even more basic tasks. Despite the assistance of

counsel and stewardship through Crede's contacts at CNTC, Defendant 22nd Century never opened a garden-variety bank account in Hong Kong needed to secure governmental approval for the WFOE. It also failed to perform a routine audit of the shell company necessary to gain CNTC's approvals, even while it assured Peizer and Crede that such an audit was imminent.

34. After several months of failing to open a bank account, form the WFOE, and accomplish other basic prerequisites, 22nd Century's failure became an embarrassment to CNTC and Crede's contact, Mr. Sun. These failures played out publicly in the news and among shareholders. Indeed, the internal dissension at 22nd Century over the continued failures in China led to 22nd Century firing its Chairman and CEO, Joe Pandolfino, who had assisted with the negotiation of the SPA, Crede Warrants, and China venture documentation, and acknowledged the unitary nature of the financing arrangement, and the need for Crede's $10 million investment to serve as capital for the WFOE.

35. While 22nd Century press releases in October 2014, failed to fully explain the genesis for Pandolfino's departure, it was widely known among 22nd Century shareholders and insiders that Pandolfino's termination was directly tied to 22nd Century's failures in China, in particular his alienation of the Chinese officials needed to secure a contract with CNTC. Pandolfino's termination reflected a "revolving door" management strategy for the China JV, with 22nd Century appointing a new face to lead the venture seemingly every other month. But this revolving door of Chairman Jim Cornell, CEO Henry Sicagnano and General Counsel Thomas James fared no better in China than Pandolfino had -- although they continued to act in bad faith. Cornell and Sicignano acknowledged the inexplicable delays by 22nd Century that contributed to the erosion of the relationship with the CNTC and 22nd Century Asia's failure.

The effect of these delays, and the China failure was not lost on actual and prospective investors in 22nd Century.

36. While 22nd Century's stock price climbed in response to the announcement of the China JV, the stock price steadily dropped as the failures in China took root, ultimately dropping more than 75% from the immediate post-announcement price.

37. As the balance of 2014 and the first half of 2015 passed without 22nd Century having formed the WFOE, 22nd Century's senior management acknowledged in direct communications with Mr. Peizer that 22nd Century was squandering the opportunities in China.

D. **22nd Century Attempts to Circumvent Crede and Take the China Opportunity for Itself**

38. Peizer and others at Crede at all times attempted to assure that 22nd Century management took advantage of the opportunity, presented by the relationship with CNTC. Peizer and Crede remained committed to helping 22nd Century gain entry into the China market and succeed, which 22nd Century representatives, including General Counsel, Thomas James, openly acknowledged and applauded over email.

39. Nevertheless, Defendant 22nd Century was operating behind the scenes to take the China opportunity for itself and cut Crede and Peizer out entirely. This plan may have succeeded, but for the fact that CNTC executives alerted Crede to the wrongful conduct.

40. In April 2015, Crede learned through one of its contacts at CNTC, Dr. He, that a 22nd Century employee named Justin Lee had secretly reached out to Dr. He directly about securing tobacco permits and regulatory approval for 22nd Century to pursue a contract with CNTC, independent of 22nd Century Asia. The overture was a patent breach of the exclusivity rights of the China JV Agreement. Notably, Mr. Lee was hired after he served as a translator for

Dr. He during his visit to 22nd Century facilities in Buffalo, New York in 2014 in conjunction with negotiations with 22nd Century Asia.

41.     Dr. He was offended by 22nd Century's overtures, and alarmed at their effort to pursue the opportunity behind Crede and the other JV partner's back and without Mr. Sun's involvement. His report to Crede frustrated the overture, while also revealing the true reason for the failure of the China JV – the desire by Defendant to cut out its junior partners.

42.     22nd Century pursued this improper strategy all while publicly promoting the China JV. Indeed, 22nd Century executives disingenuously championed the China JV's progress and prospects for success on 22nd Century earnings calls.

### E. 22nd Century Rebuffs Crede and Terminates the China JV

43.     In early 2015, as the China venture floundered, Crede's Chairman Terren Peizer expressed criticism of Crede's senior executives and its Board, repeatedly reminding them of their contractual obligations to develop the China JV. He did so in emails, sent privately to 22nd Century insiders.

44.     But 22nd Century continued its prior pattern of impeding the China JV. Meanwhile, 22nd Century's share prices entered a precipitous decline.

45.     Notwithstanding the falling stock price, 22nd Century executives continued to make poor business decisions, electing to secure financing from hedge funds, who sought short-term gains, rather than pursue a long term strategic investment from Crede. 22nd Century sold stock to one particular hedge fund on less favorable terms than Crede offered. While Crede's offer would have once again provided the critical capital 22nd Century Asia needed to succeed, the hedge fund opportunistically sold its stock, and exited its position in 22nd Century entirely. (Incredibly, 22nd Century once again rebuked Crede and did another deal with the same hedge fund six months later.) When these facts were brought to the attention of 22nd Century

Chairman, Jim Cornell, they were blithely brushed off. Meanwhile, 22nd Century management, including Cornell, retained their handsome compensation awards.

46.  On June 22, 2015, 22nd Century served Crede with a notice of termination under the China JV Agreement, citing only the failure to secure a contract with CNTC as a basis. But 22nd Century had caused this very problem by failing to assure that the China JV completed the most basic tasks and then surreptitiously approaching CNTC for its own benefit. Indeed, despite its clear willingness to proceed, CNTC could not order any samples of 22nd Century Tobacco without formation of the WFOE.

47.  Notwithstanding Defendant's obstruction, Peizer and Crede continued to try to work with 22nd Century to pursue the China venture. Indeed, in July 2015, Peizer once again laid out a strategy plan for success in China, and implored management to capitalize on the opportunity in China.

48.  Peizer was not alone in his concern over 22nd Century's failures in China. 22nd Century's lone independent industry board member, Rick Sanders, former President and CEO of Santa Fe Natural Tobacco, acknowledged the unique opportunity with the CNTC – noting that any of the multi-national tobacco companies would do anything possible to seize the opportunity. Sanders also applauded Peizer's efforts to get China back on track even after 22nd Century terminated the China JV

**F.   22nd Century Dishonors Crede's Exchange Rights in the Tranche 1A Warrant Agreement**

49.  In March 2016, defendant 22nd Century seized on Peizer's emails to 22nd Century management in 2015 as a pretext to deprive Crede of the Exchange Right in the Tranche 1A Warrant Agreement, which coincided with a dramatic decline in the price of the stock, which would have resulted in Crede receiving substantially more shares under the exchange formula

than it would have received one year earlier. According to a 22nd Century letter dated March 10, 2016, to Crede, these emails, and a demand email sent in March 2016 by Mr. Peizer accusing 22nd Century of breach, constituted a breach of the "Activity Restrictions" in the Tranche 1A Warrant Agreement. Those restrictions generally prohibit Crede from seeking Board representation or playing a public role in corporate governance. By letter dated March 10, 2016, Defendant advised Crede that the Exchange Right was "null and void." Defendant is mistaken in its claim regarding the "Activity Restrictions" provision. More important, that section provides, in no uncertain terms, that any non-compliance does not provide a basis to deprive Crede of its economic rights under the Tranche 1A Warrant Agreement. Section 1(h) of the Agreement, the "Activity Restrictions" provision, provides: "The restrictions contained in this paragraph (h) shall not limit Holder's rights to enforce its rights or exercise its rights as to the Securities or under this Warrant."

50. Defendant 22nd Century no doubt realized that its share price was plummeting and that Crede would soon be forced to exercise its Exchange Right due to the looming expiration period of the warrant. In response, 22nd Century engaged in a deeply misguided strategy to save face. Among other things, 22nd Century fabricated a story blaming the decline in 22nd Century's share price on Crede and other investors selling 22nd Century shares short. But Crede never shorted one share of 22nd Century stock. In fact, Crede owns more shares of 22nd Century stock today than it purchased through the Finance Agreement. And the Tranche 1A Warrants Agreement clearly provided no basis for dishonoring Crede's Exchange Right. Absent Defendant's March 10 letter blocking Crede's exercise, Crede would have tendered its Exchange Right, consistent with other exercise limitations, to recover the full amount of its value.

51. By virtue of its March 10 letter, Defendant has repudiated the Exchange Right and the SPA. As of this filing, Plaintiff has exercised the Exchange Right in part, in an amount Plaintiff believes it can liquidate promptly, and within the ownership limitations in the Tranche 1A Warrant. Unless blocked by Defendant, Plaintiff intends to continue to exercise the Exchange Right to obtain the full value of the Warrant.

### FIRST CAUSE OF ACTION
### (Breach of Contract – Failure to Pursue China Joint Venture)

52. Plaintiff restates the allegations in paragraphs 1 through 51, as if set forth fully herein.

53. Plaintiff has fully performed its obligations under the Finance Agreement.

54. Defendant has breached and repudiated its obligations under the Finance Agreement, both express and implied, including the implied obligation of good faith and fair dealing contained in all agreements under New York law.

55. As a direct proximate and foreseeable result of Defendant's breaches, Plaintiff has been damaged in an amount to be determined at trial, but believed to exceed the sum of $250 million.

### SECOND CAUSE OF ACTION
### (Breach of Contract – Repudiation of SPA)

56. Plaintiff restates the allegations in paragraphs 1 through 55, as if set forth fully herein.

57. Plaintiff and Defendant had a viable, enforceable contract in the SPA, and the Crede Warrants.

58. The warrants were a material inducement and component of Plaintiff's $10 million investment in 22nd Century pursuant to the SPA.

59. That Tranche 1A Warrants Agreement provided that Plaintiff had the clear, unambiguous right to exchange those warrants for shares of common stock in 22nd Century with a stated value.

60. Plaintiff has fully performed under the Tranche 1A Warrants Agreement and all other related agreements with Defendant.

61. By virtue of its March 10 letter, Defendant has blocked Plaintiff from exercising the Exchange Right. Defendant has thus repudiated the Exchange Right and the SPA, depriving Plaintiff of the full value of its $10 million investment.

62. Defendant has substantially defeated the purpose and objective of the SPA.

63. Plaintiff is ready, willing and able to tender its common shares and remaining warrants in exchange for return of its $10 million investment.

64. Plaintiff has no adequate remedy at law.

65. As a result of the foregoing, Plaintiff is entitled to rescission of the SPA and the return of $10 million.

## THIRD CAUSE OF ACTION
### (Breach of Contract – Failure to Honor Tranche 1A Warrant Exchange Right)

66. Plaintiff restates the allegations in paragraphs 1 through 65, as if set forth fully herein.

67. Plaintiff and Defendant entered into a valid and enforceable contract for the issuance of Tranche 1A Warrants.

68. The Tranche 1A Warrant Agreement provides that Plaintiff has the clear, unambiguous right to exchange those warrants for shares of common stock in 22nd Century.

69. Plaintiff has fully performed under the Tranche 1A Warrant Agreement.

70. By virtue of its March 10 letter, Defendant has blocked Plaintiff from exercising the Exchange Right. As a result of Defendant's breach, plaintiff has suffered at least $2.5 million in damages. Plaintiff is further entitled to recover its attorneys' fees and costs under the Tranche 1A Warrant Agreement.

### FOURTH CAUSE OF ACTION
### (Tortious Interference with Contract)

71. Plaintiff restates the allegations in paragraphs 1 through 70, as if set forth fully herein.

72. There was an enforceable contract between Plaintiff and 22nd Century Asia in the form of the China JV Agreement.

73. Defendant 22nd Century knew of that contract.

74. Defendant 22nd Century intended to disrupt that contract and improperly caused 22nd Century Asia to breach that contract. It acted with malice and intent to secure a benefit for itself, at the expense of Crede, its joint venture partner, strategic investor and largest shareholder.

75. Defendant 22nd Century's conduct prevented performance of the contract and made it more expensive and difficult.

76. Plaintiff Crede was harmed as a result of Defendant 22nd Century's conduct in an amount to be determined at trial but believed to be in excess of $500 million.

### FIFTH CAUSE OF ACTION
### (Permanent Injunction)

77. Plaintiff restates the allegations in paragraphs 1 through 76, as if set forth fully herein.

78. Defendant 22nd Century has wrongfully continued to pursue the sale and marketing of its tobacco products in China outside of the China JV Agreement in clear violation of that Agreement.

79. Absent an injunction preventing Defendant 22nd Century from pursuing such activities, Plaintiff will be irreparably harmed by, among other things, loss of a valuable business opportunity and participation in a lucrative joint venture that is not compensable by monetary damages. Among other things, Crede suffers irreparable harm each day that its exclusivity right is dishonored by 22nd Century.

80. The balance of equities weighs in favor of Plaintiff, whose bargained-for exclusivity right has been violated by Defendant's secret efforts to usurp the opportunity to market and sell its tobacco products in China for its exclusive benefit.

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A. Awarding damages to Plaintiff in an amount to be determined at trial but reasonably believed to be in excess of $500 million, and rescission of the finance agreement pursuant to which it invested $10 million in 22nd Century.

B. Granting Plaintiff a permanent injunction prohibiting Defendant from continuing to pursue the sale and marketing of its tobacco products in China without Plaintiff's involvement.

C. Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
       April 26, 2016

OLSHAN FROME WOLOSKY LLP

By: _____
Thomas J. Fleming
Brian A. Katz
*Attorneys for Plaintiff*
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300