UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
CREDE CG III, LTD.,                                              :

                                                                          :     Case No.: 1:16-cv-03103 (KPF)

                                  *Plaintiff*,                                    :

                   -against-                            :

22nd CENTURY GROUP, INC.,                     :

                               *Defendant*.                             :
-------------------------------------------------------------------X

## DECLARATION OF HENRY SICIGNANO, III

HENRY SICIGNANO, III, under penalty of perjury, declares as follows:

1. I am the President and Chief Executive Officer of 22nd Century Group, Inc. ("XXII"), the Defendant in this action. I submit this declaration on personal knowledge on behalf of XXII and in opposition to Plaintiff Crede CG III, Ltd. ("Plaintiff") Motion for Preliminary Injunction ("Motion").

### XXII is Not Located in, and None of the Alleged Events or Omissions Occurred in, the Southern District of New York

1. XXII is a plant biotechnology company founded in 1998 that focuses on the research, development, licensing, manufacturing, sale and distribution of specialty proprietary tobacco products, including reduced-risk or modified risk tobacco products, as well as smoking cessation low-nicotine tobacco products, among others.

2. XXII is a Nevada corporation with its headquarters and principal place of business located in Clarence, Erie County, New York.

3. XXII is a resident of the Western District of New York, and not the Southern District of New York.

4. In addition, XXII:

    a. Does not have any offices in the Southern District of New York;

    b. Does not own any real estate in the Southern District of New York;

    c. Does not regularly conduct business in the Southern District of New York; and

    d. Does not have continuous and systematic contacts with the Southern District of New York.

5. Although XXII does have one part-time employee who happens to live in the Southern District of New York, she is a sales person who covers the Northeast territory and only makes occasional sales visits in the Southern District of New York.  Further, although XXII does sell products to a single distributor in the Southern District of New York, 0.68% of XXII's total net sales in 2015, and 0.25% of XXII's total net sales in the first quarter of 2016, were to this single distributor in the Southern District of New York.  Those sales were unrelated to Plaintiff's claims.

6. Further, none of the alleged events or omissions that Plaintiff alleges give rise to the claims in the Amended Complaint occurred in the Southern District of New York.

7. The contracts at issue were not negotiated, executed or performed in the Southern District of New York, and the alleged breaches did not occur in the Southern District of New York.

8. Instead, a substantial portion of the alleged events or omissions giving rise to the alleged claims occurred in the Western District of New York, where XXII's principal place of business is located.  All of XXII's executive employees and the applicable members of XXII's Board of Directors, who would be the primary potential XXII witnesses in this dispute, and all of

XXII's documents related to this dispute, are also located at XXII's principal place of business located in the Western District of New York.

9. Any other of the alleged events or omissions would have occurred in Los Angeles, California, where Plaintiff alleges its principal place of business is located, or in China, where certain performance was to occur under certain of the contracts at issue, not in the Southern District of New York.

10. In addition, the parties agreed in the Shareholder's Agreement ("JV Agreement"), which governed any efforts to pursue sales of tobacco products in China through their joint venture entity, 22nd Century Asia, Ltd., that exclusive venue for any disputes arising out of or related to the JV Agreement or 22nd Century Asia would be in the Western District of New York. (JV Agreement, § 16.12). A true and correct copy of the JV Agreement is attached to this declaration as **Exhibit 1**.

## XXII is a Financially Viable Company

11. XXII became a public company in 2011, and its common stock trades on the New York Stock Exchange MKT under the stock symbol XXII. Since becoming a public company, XXII has been successful in growing its revenues from various sources, including licensing of certain of its intellectual property ("IP") to various entities, including British American Tobacco ("BAT"), selling certain of its specialty tobacco products in the marketplace and to the National Institute on Drug Abuse ("NIDA"), a part of the National Institutes of Health ("NIH"), for scientific research funded by the U.S. Food and Drug Administration ("FDA"), manufacturing products for itself and third-parties, and working to provide tobacco products for government research purposes.

12. XXII"s revenues have increased from less than $500,000 in total revenues in the year 2014 to more than $8,500,000 in total revenues for the year 2015, and XXII has publicly stated that total revenues for the year 2016 are estimated to exceed $12,000,000.

13. However, while XXII has been successful in growing its revenue, its primary focus has been on continued research and development of its proprietary tobacco products in order to try to bring more products to the marketplace and obtain FDA approval of certain of its smoking cessation products and other modified risk products.

14. Due to the capital intensive nature of this research and development work, XXII has not yet been profitable, and has continued to obtain outside investment to fund its research and development work, as well as its operations.

15. Since 2011, XXII has raised more than $39 million in gross proceeds from outside investors, and has XXII has continuously operated on this financial a model since 2011.

16. For example, after the $10,000,000 capital raise from Plaintiff in September 2014, XXII raised gross proceeds of $6,000,000 in June 2015 and $5,500,000 in February 2016. In each of those cases, XXII had issued public SEC filings with cautionary language similar to the language Plaintiff points to in its Motion for Preliminary Injunction from XXII's Quarterly Report on SEC Form 10-Q for the quarter ended March 31, 2016, as publicly filed with the SEC on May 10, 2016 and XXII's Annual Report on SEC Form 10-K for the year ended December 31, 2015, as publicly filed with the SEC on February 18, 2016.

17. Specifically, prior to Plaintiff's $10,000,000 investment in September 2014, XXII had publicly filed on January 30, 2014 its Annual Report on SEC Form 10-K for the period ended December 31, 2013, which included similar language, such as: (a) "We have had a history of losses, and we may be unable to achieve and sustain profitability;" (b) "There is no guarantee

that we will be able to achieve or sustain profitability in the future . . . . An inability to successfully achieve profitability may decrease our long-term viability;" (c) "We have had a history of negative cash flow, and our ability to sustain positive cash flow is uncertain;" and (d) "An inability to successfully implement our net income producing initiatives may decrease our long-term viability." A true and correct copy of such Form 10-K for the year ended December 31, 2013, is attached as **Exhibit 2**.

18.     Similarly, shortly after Plaintiff's investment in September 2014, and prior to XXII's capital raise in June 2015, XXII issued another Annual Report on Form 10-K for the year ended December 31, 2014, which included language that "We have had a history of losses, and we may be unable to achieve and sustain profitability," and that "We have had a history of negative cash flow, and our ability to sustain positive cash flow is uncertain."  A true and correct copy of such Form 10-K for the year ended December 31, 2014, is attached as **Exhibit 3**.

19.     Further, XXII's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2015, as filed by XXII with the SEC on May 11, 2015, which was prior to the June 2015 capital raise by XXII, also included language providing that "We must successfully execute our business plan to increase revenue in order to achieve positive cash flows to sustain adequate liquidity without requiring additional funds from external sources to meet minimum operating requirements," and that "There can be no assurance that additional capital, if required, will be available on acceptable terms or at all."  A true and correct copy of such Form 10-Q for the quarterly period ended March 31, 2015, is attached as **Exhibit 4**.

20.     As of March 31, 2016, XXII had approximately $6,052,000 in cash on hand, and as in the past, XXII intends to raise investment capital in the market to fund its operations as needed.  XXII has the authority to raise up to an additional approximately $27 million at any

time through June 5, 2017, pursuant to its Form S-3 universal shelf registration statement filed with the SEC and declared effective by the SEC on June 5, 2014. Again, XXII raised $5 million in investment capital as recently as February 2016.

21. Not only does XXII have incoming revenue and the authority to raise capital in the market, but XXII also has very little debt and maintains a significant IP portfolio. More specifically, as of March 31, 2016, XXII only has approximately $623,000 in total outstanding debt. XXII's IP portfolio consists of more than 200 issued patents and more than 50 pending patent applications, and it had a cost basis and net book value of approximately $5,290,000 and $3,586,000, respectively, as of March 31, 2016. XXII's total assets are valued under generally accepted accounting principles consistently applied ("GAAP") at approximately $20,000,000 as of March 31, 2016.

22. The most recent opinion of XXII's independent auditors, Freed Maxick CPA's, PC, dated February 18 2016, did not include a "going concern" qualification to their opinion. A true and correct copy of this February 18, 2016, accounting opinion is attached hereto as **Exhibit 5**.

23. In short, XXII is a viable going concern with revenues and the authority and intent to continue to raise money in the market as needed. In addition, XXII has very little corporate debt and it has assets well in excess of the maximum $2.8 million Plaintiff alleges it is entitled to in Plaintiff's Motion for Preliminary Injunction.

### The Business Dealings Between XXII and Plaintiff

24. In 2014, Terren Peizer approached XXII regarding his interest in making an investment in XXII through his investment entity, Plaintiff.

25.     The parties entered into negotiations regarding the investment, which ultimately resulted in the execution of a Securities Purchase Agreement ("SPA") dated September 15, 2014, under which Plaintiff invested $10,000,000 in XXII and received 3,871,767 shares of XXII common stock.

26.     In addition to this investment, Mr. Peizer also suggested to XXII that they work together in a joint venture in order to pursue sales of XXII's specialty tobacco products in China. Mr. Peizer represented to XXII that Mr. Peizer and Plaintiff, directly and through its affiliates, had substantial experience and expertise in doing business in China, and in forming, financing and operating wholly foreign-owned enterprises in China, and that Mr. Peizer could facilitate entry into the Chinese tobacco market, which is the largest tobacco market in the world.

27.     In reliance on Mr. Peizer's representations on behalf of Plaintiff and himself, XXII agreed to form a joint venture, 22nd Century Asia, Ltd., ("22nd Century Asia"), with Plaintiff and another third party investor suggested by Mr. Peizer and Plaintiff, Century Champion Investments, Ltd., ("Champion"), pursuant to a Shareholders Agreement dated September 29, 2014 (the "JV Agreement").  The purpose of the JV Agreement was to govern 22nd Century Asia in its attempts to pursue a long-term contract with China Tobacco International ("China Tobacco") to sell in China through 22nd Century Asia the tobacco products produced by XXII.

28.     Because Mr. Peizer and Plaintiff represented that they had substantial experience and business contacts in China, and as expressly contemplated by the JV Agreement on page 2 thereof, XXII entered into a Consulting Agreement with Plaintiff and Mr. Peizer dated September 29, 2014, ("Consulting Agreement").  Under the Consulting Agreement, Plaintiff and Mr. Peizer agreed to devote their "efforts, business time and attention to providing consulting

services" to XXII in connection with its involvement with the China venture for the purposes of "maximizing the amount of proprietary tobacco" of XXII that "is purchased by the China JV," in exchange for certain warrants in the form attached to the Consulting Agreement.  A true and correct copy of the Consulting Agreement is attached as **Exhibit 6**.

29. After entering into the Consulting Agreement, XXII learned that Mr. Peizer had vastly overstated his connections, experience and ability to assist the China venture to do business with China Tobacco.  In fact, among many of the problems with the directions given to XXII by Plaintiff and Mr. Peizer regarding pursuing potential business in China, Plaintiff directed XXII to deposit money into an account controlled by Dennis Sun, an employee of China National Tobacco Corporation, a Chinese government owned organization.  However, XXII was advised that such payments would be in violation of the Foreign Corrupt Practices Act, and XXII declined to follow such illegal directions by Plaintiff.

### The Tranche 1A Warrant

30. In exchange for Plaintiff's promised services under the Consulting Agreement, XXII agreed to issue warrants to Plaintiff to acquire a total of 4,250,000 shares of XXII common stock.  These warrants were divided into tranches, and the parties executed separate warrant agreements for each tranche:  the Tranche 1A Warrant, the Tranche 1B Warrant, the Tranche 2 Warrant and the Tranche 3 Warrant (collectively, the "Warrant Agreements").  True and accurate copies of these Warrant Agreements are attached as **Exhibits 7-10** hereto.

31. The Tranche 1A Warrant provided in Section 1 that Plaintiff could *exercise* the warrant by purchasing up to 1,250,000 shares of common stock from XXII at the "Exercise Price" of $3.36 per share.  Ex. 7, § 1(a) and (b).  The other Warrant Agreements similarly

provided that Plaintiff could *exercise* the warrant by purchasing up to an additional 1,000,000 shares of XXII common stock under each of the other Warrants.

32.     The substantive provisions of each of the Warrant Agreements were virtually identical except in one respect:  the Tranche 1A Warrant contained another, highly unusual provision in Section 5 that allowed for Plaintiff, if the price of XXII's stock declined below the Exercise Price, to *exchange* all or a portion of Plaintiff's warrants for fully paid and non-assessable shares of XXII common stock without payment of any cash, with the consideration instead being the warrant shares exchanged, i.e., the "Exchange Right."  Ex. 7, § 5(a).  This Exchange Right was "[i]n addition to the rights of the [Plaintiff] in Section 1" to exercise the warrants, i.e., the Exercise Right.

33.     The Exchange Right is highly unusual because, pursuant to Section 5(b) of the Tranche 1A Warrant, the more the market price of XXII's common stock declines below the Exercise Price, the greater the number of shares of XXII common stock that Plaintiff would receive upon its exchange of the Tranche 1A Warrant.  Ex. 7, § 5(b).

34.     Thus, Plaintiff would potentially have a strong incentive when XXII's common stock is below the Exercise Price to take actions that could drive the stock price even lower so as to increase the amount of shares of XXII common stock Plaintiff would receive when making an exchange request to XXII.  In other words, the lower Plaintiff could drive the stock price, the more XXII stock could be obtained by Plaintiff under the Exchange Rights.  Similarly, if Plaintiff had or might sell or facilitate the sale of XXII stock on a short basis, Plaintiff would further be incentivized to drive the stock price down to increase the value of the Exchange Right.

35.     Because of this, XXII did not want the Exchange Right to be included in any of the Warrants provided to Plaintiff, and after significant negotiations on this point, the parties

settled on only including the Exchange Right in the Tranche 1A Warrant, and not in any of the other three Warrants issued to Plaintiff under the Consulting Agreement.

36.     However, because the Exchange Right provision was included in the Tranche 1A Warrant, it was also important to XXII that Plaintiff's ability to invoke the Exchange Right in Section 5 of the Tranche 1A Warrant be subject to and curtailed by certain restrictions on Plaintiff's activities so that Plaintiff could not use the Exchange Right to benefit Plaintiff at the expense of XXII.

37.     Accordingly, it was expressly agreed by the parties in the Exchange Right provision under Section 5 of the Tranche 1A Warrant, that "this Warrant shall be exchangeable by the Holder on a cashless basis as further set forth below (***and subject to the limitations set forth in Section 1(h)(ii) hereof***).'' Ex. 7, §5 (Emphasis added). The foregoing was intended to and plainly barred Plaintiff's use of the Exchange Right if Plaintiff or its affiliates violated the activity limitations in Section 1(h)(ii) of the Tranche 1A Warrant.

38.     The activity limitations in Section 1(h)(ii) of the Tranche 1A Warrant were identified as "Activity Restrictions" regarding the actions of Plaintiff and its affiliates in connection with XXII as follows:

> Activity Restrictions. (i) ***For so long as Holder or any of its Affiliates holds any Warrants or any Warrant Shares, neither Holder nor any Affiliate will***: (i) vote any shares of Common Stock beneficially owned by it, solicit any proxies, or seek to advise or influence any Person with respect to any voting securities of the Company; (ii) ***engage or participate in any actions, plans or proposals which relate to or would result in*** (A) acquiring additional securities of the Company, alone or together with any other Person, which would result in Holder or its Affiliates beneficially owning (within the meaning of Section 13(d) under the 1934 Act) more than 9.9% of the Common Stock, (B) an extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving Company or any of its Subsidiaries, (C) a sale or transfer of a material amount of assets of

>   the Company or any of its Subsidiaries, (D) *any change in the present board of directors or management of the Company, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board*, (E) any material change in the present capitalization or dividend policy of the Company, (F) *any other material change in the Company's business or corporate structure*, including but not limited to, if the Company is a registered closed-end investment company, any plans or proposals to make any changes in its investment policy for which a vote is required by Section 13 of the Investment Company Act of 1940, (G) changes in the Company's charter, bylaws or instruments corresponding thereto or other actions which may impede the acquisition of control of the Company by any Person, (H) causing a class of securities of the Company to be delisted from a national securities exchange or to cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association, (I) a class of equity securities of the Company becoming eligible for termination of registration pursuant to Section 12(g)(4) of the Act, or (J) *any action, intention, plan or arrangement similar to any of those enumerated above*; or (iii) request the Company or its directors, officers, employees, agents or representatives to amend or waive any provision of this paragraph. The restrictions contained in this paragraph (h) shall not limit Holder's rights to enforce its rights or exercise its rights as to the Securities or under this Warrant.
>
>   (Emphasis added).

39.     These Activity Restrictions were included in each of the four Warrant Agreements, and were important to XXII.  They were intended to ensure that Plaintiff would not use its status as XXII's largest stockholder to foment change at the board or senior management level, or to seek increased control over XXII.  This threat, of course, would be magnified if Plaintiff used the Exchange Right to multiply Plaintiff's shareholdings in XXII, especially during a time when XXII's stock price fell below the Exercise Price.

40.     While Section 1(h) of the Warrant provides that the Activity Restrictions shall not limit Plaintiff's "rights to enforce its rights or *exercise* its rights as to the Securities or under this Warrant," it specifically does not mention or apply to the *exchange* of warrants under the Exchange Right contained in Section 5 of the Warrant.  Ex. 7, § 1(h) (Emphasis added).

41.     So that the record is clear, XXII does not contend that Plaintiff's violation of the Activity Restrictions applies to restrict Plaintiff's right to *exercise* the Tranche 1A Warrant under *Section 1* thereof at or above the Exercise Price.

42.     Instead, XXII contends that, as plainly stated, Plaintiff's violations of the Activity Restrictions do limit Plaintiff's right to *exchange* the Tranche 1A Warrant under the separate Exchange Right provision in Section 5 of the Tranche 1A Warrant.  This is because, as noted above, the Exchange Right provision in Section 5 expressly provides that it is subject to the Activity Restrictions set forth in Section 1(h)(ii) of the Tranche 1A Warrant.

### Plaintiff's Violations of the Activity Restrictions

43.     After the parties entered into the Tranche 1A Warrant, Plaintiff and its principal, Terren Peizer, began to violate the Activity Restrictions set forth in Section 1(h)(ii) of the Tranche 1A Warrant by attempting to cause changes in XXII's management and Board of Directors, including, without limitation, demanding that Mr. Peizer be added to XXII's Board, and that certain existing XXII directors leave the XXII Board.  Plaintiff and Mr. Peizer engaged in such actions via numerous written and verbal communications to senior management of XXII, members of the Board of Directors of XXII, outside investors, business press, stock analysts, investment bankers and others.

44.      The violations of the Activity Restrictions by Plaintiff currently known to XXII include the following:

- On February 18, 2015, Mr. Peizer sent an email to James Cornell, the Chairman of the Board of Directors of XXII, and Henry Sicignano, the President and Chief Executive Officer of XXII, copying representatives from Chardan Capital Markets ("Chardan"), the Company's investment banker, Sam Ginzburg and Eric Goldstein (both of whom are employees of First New York, a shareholder of XXII), criticizing the XXII Board of Directors and stating that Mr. Peizer was "serious as a heart attack" that "change will necessarily come about" due to the Board's purported failure to listen to XXII's shareholders – meaning Mr. Peizer and Plaintiff.  A true and correct copy of such email is attached as **Exhibit 11**.

- On March 19, 2015, Mr. Peizer sent an email to XXII Board Chairman James Cornell and XXII CEO Henry Sicignano in which Peizer demanded that Mr. Cornell "must step aside" and "get out of the way," and that Peizer be "in control." Peizer continued, threatening that "frankly I rather [sic] put a proxy on the board and Chairman" at the upcoming annual meeting in late April 2015. A true and correct copy of such email is attached as **Exhibit 12**.

- On March 25, 2015, Mr. Peizer sent an email to XXII Board Chairman James Cornell and XXII CEO Henry Sicignano, copying the Company's investment bankers (at Chardan), Angelo Tomasello (a shareholder of XXII), Sam Ginzburg (an employee of First New York, a shareholder of XXII), Eric Goldstein (an employee of First New York, a shareholder of XXII), Rich Abbe (an employee of Iroquois Capital, a shareholder of XXII), Richard Saffire (a shareholder of XXII) and Joseph Pandolfino (a shareholder of XXII), and demanding change on the Board of Directors of XXII. Mr. Peizer's email triggered responsive emails from Mr. Tomasello, Mr. Goldstein, and Mr. Pandolfino's attorney, Kenneth Rose, Esq. A true and correct copy of such email is attached as **Exhibit 13.**

- XXII, through Mr. Sicignano, was informed by its investment banker, Joseph Reda of Chardan, that on April 1, 2015, Mr. Peizer orally reiterated his demands to Mr. Reda that (1) XXII Board Chairman James Cornell resign as Chairman of the Board of XXII, (2) Peizer be added to the Board of XXII, and (3) Peizer be elected as Chairman of the Board of XXII.

- On April 9, 2015, Mr. Peizer sent an email to each of the members of the Board of Directors of XXII, as well XXII CEO Henry Sicignano, in which he stated that "the investment community continues to lose faith in the company's leadership." He then referred to the "loss of confidence among shareholders about the ability of Management and the Board to lead the Company" and that "unless I meet with authorized representatives of the company by April 24, 2015 . . . I will have no recourse but to pursue alternative publically [sic] disclosed courses of action." A true and correct copy of such email is attached as **Exhibit 14.**

- On April 10, 2015, Mr. Peizer sent an email to each of the members of the XXII Board, as well as XXII CEO Henry Sicignano, in which Mr. Peizer referenced his prior demands for the Chairman of the Board of XXII to resign and his threats to raise the issue at the upcoming annual shareholders meeting. In an obvious attempt to influence others to join him in his improper quest, Mr. Peizer also took pains to send the email to his counsel, as well as Eric Goldstein (an employee of First New York, a shareholder of XXII), Sam Ginzburg (an employee of First New York, a shareholder of XXII), Rich Abbe (an employee of Iroquois Capital, a shareholder of XXII), Richard Saffire (a shareholder of XXII), Angelo Tomasello (a shareholder of XXII), and Joe Reda and Jonathan Schechter (both of whom are employed by Chardan, the investment banker of XXII). As a result, XXII was forced to attempt to contact each investor copied on the email in an attempt to

try to mitigate the damage caused by the email from Peizer. A true and correct copy of such email is attached as **Exhibit 15.**

- On April 22, 2015, James Cornell, the XXII Chairman of the Board, responded to Mr. Peizer in which Mr. Cornell declined Peizer's proposal for Cornell to step down from the Board and for Peizer to be added to the Board, and reminded Peizer of his obligations under the Activity Restrictions under the Tranche 1A Warrant.

- Notwithstanding this request and reminder, Mr. Peizer began to take his demands even more publicly to shareholders and other third-parties outside of XXII. On April 24, 2015, Peizer sent an email to James Cornell and Henry Sicignano in which he disclosed confidential information relating to XXII's joint venture in China and blamed the XXII Board and senior management for "squandering" the opportunity in China and "abdicating" its fiduciary obligations. Again, Mr. Peizer copied not only the same recipients of the April 10 email, but also his counsel, Allison Yeh (an affiliate in China of Plaintiff and Mr. Peizer), Joe Reda (an employee of Chardan, the investment banker of XXII), Jonathan Schechter (an employee of Chardan, the investment banker of XXII), Richard Saffire (a shareholder of XXII), Mark Kane (an outside accountant performing work for XXII), Dr. Dennis Chugh (a shareholder of XXII), Jason DiPaola (an employee of Chardan, the investment banker of XXII), Rich Abbe (an employee of Iroquois Capital, a shareholder of XXII), Eric Goldstein (an employee of Iroquois Capital, a shareholder of XXII), Edgar Chuan (an affiliate in China of Plaintiff and Mr. Peizer), Andrew Haag (an employee of IRTH Communications, an investor relations firm performing work for XXII), Robert Haag (an employee of IRTH Communications, an investor relations firm performing work for XXII), Sam Ginzburg (an employee of First New York, a shareholder of XXII), Bonnie Herzog (a tobacco industry analyst with Wells Fargo Securities) and Scott Shaffer (the owner/author of an investor newsletter and a shareholder of XXII). As a result, XXII was again forced to attempt to contact each investor copied on the email in an attempt to try to mitigate the damage caused by Peizer's email. A true and correct copy of such email is attached as **Exhibit 16.**

- XXII, through Mr. Sicignano, was informed by one of XXII's large shareholders, Angelo Tomasello, that Mr. Peizer called him on May 29, 2015, to advocate changes in XXII's Board and management.

- In June 2015, Mr. Peizer sent a series of emails to XXII's management, again copying Jonas Grossman (an employee of Chardan, the investment banker of XXII), and XXII's other investment bankers at Chardan, in which Mr. Peizer continued to threaten activist actions and management change with respect to XXII.

- In February 2016, Mr. Peizer sent a series of emails to XXII, copying XXII's investment bankers, threatening that XXII either revise the terms of Mr. Peizer's warrants or be subject to Mr. Peizer taking negative action with respect to XXII's stock.

45. Further, Plaintiff has on multiple occasions threatened to negatively affect XXII's stock price. For example, Mr. Peizer has threatened at least twice to Henry Sicignano, the CEO of XXII, that Mr. Peizer would cause the market price of XXII stock to go down to $.25 per share, and that Peizer would then will simply buy up enough shares on the open market to take control of XXII. On multiple occasions, Mr. Peizer also told Mr. Sicignano that because of XXII's relatively small size, and Peizer's extensive market experience in the microcap space, that Peizer could move the share price of XXII "anywhere he wants."

46. In addition, contrary to Plaintiff's assertions in its Motion for Preliminary Injunction, Plaintiff still continues to engage in such actions in violation of the Activity Restrictions. More specifically, XXII has learned that Mr. Peizer has, as recently as May 10, 2016, communicated to XXII's investment banker and other third parties in the investment banking industry regarding Plaintiff's lawsuit against XXII in an apparent effort to influence XXII's management and stock price. Attached to this declaration as **Exhibit 17** is a true and correct copy of an email from Mr. Peizer to XXII's investment banker that the investment banker forwarded to XXII.

47. By reason of these violations of the Activity Restrictions, and prior to Plaintiff attempting to exercise the Exchange Right, XXII notified Plaintiff through a letter from XXII's counsel on March 10, 2016, XXII notified Plaintiff through a letter from XXII's counsel on March 10, 2016, that, as provided in Section 5 of the Tranche 1A Warrant, Plaintiff's repeated and intentional violations of Section 1(h)(ii) of the Tranche 1A Warrant rendered the Exchange Right provision null and void. A true and correct copy of the March 10, 2016, letter is attached hereto as **Exhibit 18.**

48. XXII similarly advised Plaintiff that the Exchange Right was null and void due to Plaintiff's violations of the Activity Restrictions in response to Plaintiff's recent attempts to invoke the Exchange provision in the Tranche 1A Warrant by sending exchange notices to XXII on April 26, 2016 and on May 17, 2016.

**The Potential Harm to XXII if the Injunction Were Granted Far Outweighs the Potential Harm to Plaintiff if the Injunction Were Denied and the Status Quo Preserved**

49. The injunction that Plaintiff seeks is to require XXII to immediately deliver 2,077,555 shares of XXII common stock so that Plaintiff can immediately liquidate the stock, and to also require XXII to deliver stock to Plaintiff for liquidation by Plaintiff in response to future exchange requests from Plaintiff. If allowed, these actions would significantly harm XXII notwithstanding Plaintiff's offer to place the proceeds from the liquidation of the stock in escrow.

50. Specifically, if an additional 2,077,555 shares of XXII common stock were issued and then liquidated, each XXII stockholder's current holdings will experience dilution and XXII will not have immediate use of any of the funds set aside in escrow. In addition, the issuance of an additional 2,077,555 shares of XXII common stock without any consideration may trigger a negative reaction in the market and a drop in stock price, causing further harm to XXII stockholders.

51. Additionally, such actions would hurt XXII in its anticipated capital raising efforts as the increased supply of shares of XXII common stock in the open market for sale may likely have a negative impact on the price at which XXII could sell its common stock in any capital raising transaction. As a practical matter, this would mean that XXII would have to issue more shares at a lower price, accelerating the dilution already experienced by stockholders as a result of Plaintiff's requested issuance of shares to Plaintiff.

52. For example, in February 2016, XXII issued 5,000,000 shares of common stock for gross proceeds of $5.5 million. If XXII had, immediately prior to such transaction, issued over 2 million shares to be sold into the open market, XXII would have presumably not been able to raise money on as favorable terms because of the additional dilutive stock issuance causing negative pressure on the stock price as a result of reduced demand and increased supply of shares of XXII common stock available in the market.

53. Plaintiff's offer to place the proceeds from liquidation of the stock in escrow for possible tender to XXII is wholly insufficient to protect against the above dilutive impact, and the likely negative impact on future capital raises.

54. Further, the sales proceeds from a large sale of XXII stock would not be expected to protect against the potential loss of the stock value to XXII. Recently, an analyst report from Chardan Capital Markets set a target price of $4.50 per share for XXII's common stock with a "Buy" recommendation. A true and correct copy of such analyst report is attached as **Exhibit 19.**

55. If that target stock price were to occur, the sales proceeds from the sale of 2,077,555 shares would be $9,348,997, as opposed to $1,745,146 if the stock were liquidated now at the $0.84 per share price that the XXII stock was trading at as of the close of market on May 29, 2016.

56. Therefore, if XXII issues common stock that is subsequently liquidated in the open market at current market prices and if XXII common stock increases in value, the expected proceeds held in escrow of $1,745,146 will not be sufficient funds to repurchase 2,077,555 shares of common stock in the open market if the analyst's target price of $4.50 per share is reached, which would be $9,348,997.50. This same detrimental result will be true for any

increase in the value of the stock above the $0.84 liquidation price, even if the stock does not reach the full target price. In any case, XXII stockholders will be permanently harmed because the additional shares will be permanently dilutive to such shareholders.

57. The requested injunction therefore does not preserve the status quo, but instead irretrievably *changes* XXII's capital stock structure to the detriment of its stockholders and has a negative and adverse impact on the price per share at which XXII can raise capital in the market.

58. Finally, Plaintiff alleges in Paragraph 50 of its Amended Complaint filed on May 19, 2016, that Plaintiff currently "owns more shares of 22nd Century stock today than it purchased" through the SPA, which was 3,871,767 shares of XXII common stock. Further, as set forth in a Schedule 13G as filed by Plaintiff with the SEC on February 16, 2016, Plaintiff owned at least 5,834,330 shares of XXII common stock as of February 16, 2016. A true and correct copy of such Schedule 13G is attached as **Exhibit 20.**

59. To XXII's knowledge, Plaintiff has not been liquidating these shares on the market, but instead continues to hold them for investment.

[Signature follows on next page]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 31, 2016

				_____
				HENRY SICIGNANO, III