UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
: 
CREDE CG III, LTD.,                                     :
:
                                  Plaintiff,           :
:
                     v.                                :
:
22ND CENTURY GROUP, INC.,                              :
:
                                  Defendant.           :
:
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  January 20, 2017

16 Civ. 3103 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff Crede CG III, LTD. ("Crede" or "Plaintiff"), an investment firm targeting companies with small market capitalizations, brought this action against 22nd Century Group, Inc. ("XXII" or "Defendant"), a plant biotechnology company, claiming breaches of and interference with the parties' contractual obligations concerning a joint venture in the People's Republic of China. In brief, Plaintiff contends that Defendant failed to fulfill the most basic tasks necessary to the joint venture's success, while Defendant responds that the venture failed because Plaintiff's principal overstated his connections, his experience, and even his abilities in order to induce Defendant to enter into the agreement.

Defendant now moves to sever Counts I, VI, and VII of Plaintiff's Amended Complaint (the "Complaint") on the grounds of improper venue, and to transfer them to the United States District Court for the Western District of New York. For the reasons that follow, Defendant's motion is granted.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties

Plaintiff is a Bermuda investment company with its principal place of business in Los Angeles, California.  (FAC ¶ 2).  It specializes in investing in companies with small market capitalization, touting its "exemplary track record of identifying companies with high-growth potential and providing them with the capital needed to achieve their business objectives and create shareholder value."  (*Id.*).

Defendant is a Nevada corporation, which has its headquarters and principal place of business in Clarence, Erie County, New York.  (Def. Br. 3 (citing Sicignano Decl. ¶ 2)).  Its securities are traded on the New York Stock Exchange under the ticker symbol "XXII."  (FAC ¶ 3).  Defendant's business "focuses on the research, development, licensing, manufacturing, sale and distribution of specialty proprietary tobacco products, including reduced-risk or modified risk tobacco products, as well as smoking cessation low-nicotine tobacco products, among others."  (Def. Br. 3 (citing Sicignano Decl. ¶ 1)).  This business is based on Defendant's "proprietary technology and plant breeding expertise," both of which allow Defendant "to regulate the levels of nicotine and

---

[1]    This Opinion draws on facts from the Complaint ("FAC," Dkt. #11), as well as the parties' briefing.  For convenience, Defendant's opening memorandum of law is referred to as "Def. Br." (Dkt. #37), Plaintiff's memorandum in opposition as "Pl. Br." (Dkt. #40), and Defendant's reply memorandum as "Def. Reply" (Dkt. #41).  The declarations attached to this briefing are referred to by the name of the declarant:  "Sicignano Decl." (Dkt. #37, Ex. A) and "Peizer Decl." (Dkt. #40, Ex. A).

nicotine alkaloids in ... tobacco plant[s], thereby facilitating the growth of tobacco with reduced nicotine content."  (FAC ¶ 3).

### 2.    The Parties' 2014 Business Dealings

In 2014, the parties began discussions regarding a potential investment in Defendant's business to be made by Plaintiff through its principal, Terren Peizer.  (FAC ¶ 7; Def. Br. 3 (citing Sicignano Decl. ¶ 24)).  The parties were mutually interested in exploring the opportunities afforded by the Chinese tobacco market, the largest in the world.  (FAC ¶¶ 6-7; Def. Br. 4 (citing Sicignano Decl. ¶ 26)).  Defendant clarifies, however, that this interest was separate from and secondary to Plaintiff's interest in investing in Defendant's business; only "[s]ubsequent to this investment" did Plaintiff begin to explore the possibility of a further agreement "to pursue sales of [Defendant's] specialty tobacco products in China."  (Def. Br. 4).

Plaintiff recalls the timeline differently.  In June 2014, months before its preliminary investment, Peizer "arranged for several critical meetings with key executives at [China National Tobacco Company ("CNTC")] to lay the groundwork for [Defendant] to obtain a valuable supply agreement" with China Tobacco International ("China Tobacco"), CNTC's subsidiary.  (FAC ¶ 6).[2]  The parties anticipated that, by 2019, such an agreement would generate "over $1 billion in aggregate revenue."  (*Id.*).  It was against this backdrop, Plaintiff explains, that the parties' negotiations began in earnest.  Discussions were

---

[2]     The occurrence of these June 2014 meetings, though not their purpose, is agreed upon by the parties in their Consulting Agreement.  (Def. Br., Ex. 6 at 1; Peizer Decl., Ex. C at 1).

undertaken to determine "a structure under which [Plaintiff] would provide [Defendant] with the resources it needed to pursue a deal with CNTC on terms that would fairly compensate [Plaintiff] for its role." (*Id.* at ¶ 7). A deal was reached in September 2014, which was "memorialized in a network of integrated contracts, drafted and negotiated in tandem," and executed during that month. (*Id.*).

### 3. The Contracts at Issue

#### a. The Securities Purchase Agreement

The first-executed of these contracts, signed on September 17, 2014, was a Securities Purchase Agreement (the "SPA"). (FAC ¶ 8; Peizer Decl. ¶ 4). According to this agreement, Plaintiff invested $10,000,000.00 in Defendant's business in exchange for 3,871,767 shares of Defendant's common stock. (FAC ¶ 8; Peizer Decl. Ex. A; Sicignano Decl. Ex. 3).[3]

Section 4(d) of the SPA indicated that Defendant would "use the proceeds from the sale of the Securities for general business purposes." (Peizer Decl., Ex. A at 18). Section 9(a) of the agreement further recited that

> [a]ll questions concerning the construction, validity, enforcement and interpretation of this Agreement and the other Transaction Documents shall be governed by the internal laws of the State of New York .... Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan, for the adjudication of any

---

[3]   This investment and common stock placement was also announced in several of Defendant's public filings. Note 4 to the Consolidated Financial Statement in Defendant's Form 10-K Annual Report for the fiscal year ending December 31, 2014, indicated that "[o]n September 17, 2014, [Defendant] issued 3,871,767 shares of its common stock for $10,000,000." (Sicignano Decl., Ex. 3). Note 4 to Defendant's Form 10-Q for the quarter ending March 31, 2015, announced the same. (*Id.*, Ex. 4).

> dispute hereunder or under any of the other Transaction Documents or in connection herewith or therewith or with any transaction contemplated hereby or thereby or discussed herein or therein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue or such suit, action or proceeding is improper.

(*Id.* at 30).[4]  And Section 9(e) contained the contract's merger clause, establishing, among other things, that the SPA, "the NDA, the other Transaction Documents, the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein contain the entire understanding of the parties."  (*Id.* at 31).

### b.     The JV Agreement

While Defendant argues that the SPA was a standalone agreement, Plaintiff contends it was simply the first "leg of the deal."  (FAC ¶ 9).[5]  The "second leg" was executed on September 29, 2014, through a joint venture agreement (the "JV Agreement") and "a package of warrants."  (*Id.*).

---

[4]     "Transaction documents" are identified in the SPA to include the SPA, "the Registration Rights Agreement and each of the other agreements and instruments entered into or delivered by any of the parties hereto in connection with the transactions contemplated hereby and thereby, as may be amended from time to time." (Peizer Decl., Ex. A at § 3(b)).

[5]     Plaintiff also alleges that a "Side Letter Agreement" was executed simultaneously with the SPA, "which ensured that [Plaintiff] would receive a warrant for providing financing, if the China joint venture failed to close by October 14, 2016."  (FAC ¶ 8).  However, Plaintiff has not included this agreement in its pleadings or its opposition papers.  *See, e.g.*, *Garcia* v. *Pearson Educ., Inc.*, No. 15 Civ. 7289 (KPF), 2016 WL 5921083, at *4 (S.D.N.Y. Oct. 7, 2016) (discussing situations where courts could consider material outside the pleadings).

The JV Agreement comprised a Shareholders Agreement between and among Defendant, Plaintiff, and third-party Century Champion Investments, LTD., to form a new entity, 22nd Century Asia, Ltd. (the "China JV"), "to govern the marketing and sale of [Defendant's] tobacco products in Greater China, including in Macau, Taiwan and other territories." (FAC ¶ 10; *see also* Sicignano Decl., Ex. 1). Pursuant to this agreement, Defendant agreed to provide $10,000,000.00 to the China JV, "on a preferred basis," to be used as the capital for the "wholly-foreign owned enterprise in the People's Republic of China" (the "WFOE"). (Sicignano Decl., Ex. 1 at 1).[6] Simultaneously, the parties "anticipate[d] that China Tobacco [would] license certain of [Defendant's] intellectual property on a nonexclusive basis and pay a license fee to [Defendant] of not less than [$8,400,000.00]." (*Id.* at 2). In fact, Defendant's $10,000,000 capital contribution was contingent upon this licensing agreement. (*Id.* at 5). "[I]f the WFOE fail[ed] to secure an acceptable contract with China Tobacco, the Company [would] be wound up." (*Id.* at 2).

In Section 16.8, the parties provided a merger clause indicating that the JV Agreement

> supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter and constitutes ... a complete and exclusive statement of the terms of the agreement between the parties with respect to the subject matter of [the JV] Agreement, including the Recital paragraphs of [the JV]

---

6    Century Champion Investments Ltd. agreed to provide the China JV with "all of the issued and outstanding equity of Vic Corporation Limited[,] ... a company organized under the laws of Hong Kong ('Vic')." (Sicignano Decl., Ex. 1 (emphasis omitted)). Vic would then "be renamed '22nd Century Asia (Hong Kong) Ltd.,'" and would become the WFOE. (*Id.*).

> Agreement, which are hereby incorporated into and
> made a part of [the JV] Agreement as if fully set forth
> herein.

(Sicignano Decl., Ex. 1 at 44).  In Section 16.11, the parties agreed that "[a]ll

matters relating to or arising out of [the JV] Agreement or any Contemplated

Transaction and the rights of the parties (whether sounding in contract, tort, or

otherwise) will be governed by and construed and interpreted under the laws of

the State of New York."  (*Id.* at 45).  And in Section 16.12, the parties further

specified that

> any Proceeding arising out of or relating to [the JV]
> Agreement, the management and affairs of the [China
> JV] or any Contemplated Transaction shall be brought
> in the courts of the State of New York, County of Erie,
> or, if it has or can acquire jurisdiction, in the United
> States District Court for the Western District of New
> York, and each of the parties irrevocably submits to the
> exclusive jurisdiction of each such court in any such
> Proceeding, waives any objection it may now or
> hereafter have to venue or to convenience of forum,
> agrees that all claims in respect of such Proceeding
> shall be heard and determined only in any such court,
> and agrees not to bring any Proceeding arising out of or
> relating to [the JV] Agreement or any Contemplated
> Transaction in any other court.  Each party
> acknowledges and agrees that this Section 16.12
> constitutes a voluntary and bargained-for agreement
> between the parties.

(*Id.*).

### c.   The Consulting Agreement

The JV Agreement contemplated that Peizer and Plaintiff would execute a

"consulting agreement relating to services to be performed for the [China JV],"

and that this consulting agreement would "provide[] for the grant of warrants to

acquire certain securities of [Defendant], a portion of which [would] vest upon

revenue targets to be achieved by the [China JV] from the sales of [Defendant's] tobacco to China Tobacco." (Sicignano Decl., Ex. 1 at 2).  This agreement (the "Consulting Agreement") was executed simultaneously with the JV Agreement on September 29, 2014.  (*Id.*, Ex. 6 at 1; Peizer Decl., Ex. C at 1).

The parties to the Consulting Agreement were Peizer, Plaintiff, and Defendant.  (Sicignano Decl., Ex. 6 at 1; Peizer Decl., Ex. C at 1).  Among other things, Peizer and Plaintiff agreed to assist Defendant "with facilitating the sale of its tobacco products" to China Tobacco.  (FAC ¶ 11; Pl. Opp. 4-5).  The agreement's express condition precedent provided, however, that (i) the agreement would not take effect, (ii) Plaintiff and Peizer would not provide any of the agreed-upon services, and (iii) Plaintiff and Peizer would not be "entitled to any compensation or warrants of any type under th[e] Agreement[,] unless and until [Defendant], [Plaintiff], and Century Champion Investments, Ltd., ... [had] each executed documentation evidencing an equity interest in [the China JV]." (Sicignano Decl., Ex. 6 at 1; Peizer Decl., Ex. C at 1).  In other words, the Consulting Agreement was contingent upon the execution of the JV Agreement, which event was specifically identified as the "triggering event."  (Sicignano Decl., Ex. 6 at 2; Peizer Decl., Ex. C at 2).  On the business day after the occurrence of this "triggering event," Defendant would issue a series of warrants, which were attached as exhibits to the Consulting Agreement and identified as the Tranche 1A Warrant, the Tranche 1B Warrant, the Tranche 2

Warrant, and the Tranche 3 Warrant.  (Sicignano Decl., Ex. 6 at 2; Peizer Decl., Ex. C at 2).[7]

Provision 13 of the Consulting Agreement indicated that the "Agreement and the Warrants embody the complete agreement and understanding among the parties regarding the subject matter hereof and supersede[] and preempt[] any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way."  (Sicignano Decl., Ex. 6 at 9-10; Peizer Decl., Ex. C at 9-10).  The provision further stated that "[a]ll questions concerning the construction, validity and interpretation of the Agreement will be governed by the internal law … of the State of New York."  (Sicignano Decl., Ex. 6 at 10; Peizer Decl., Ex. C at 10).  The parties to the contract, per this provision, "consent[ed] to subject matter jurisdiction, personal jurisdiction and venue in the appropriate

---

[7]     The Consulting Agreement was publicly announced in the Notes to the Consolidated Financial Statement in Defendant's Form 10-K Annual Report for the fiscal year ending December 31, 2014.  (Sicignano Decl., Ex. 3).  Note 6 announces that

> [i]n connection with a joint venture arrangement entered into on September 29, 2014 by the [Defendant's] newly formed and 51% owned subsidiary, [the China JV], [Defendant] entered into a six-month Consulting Agreement … with [Plaintiff].  [Plaintiff] will provide consulting services to [the China JV] with respect to the [Defendant's] efforts to sell its proprietary tobacco products into the Asian market.  In connection with [Defendant's] entry into such a joint venture and the Consulting Agreement, [Defendant] issued [Plaintiff] 1,250,000 Tranche 1A Warrants[.]"

(*Id.*).  The SPA was separately announced in Note 4, which describes a Registration of Rights Agreement that was "a condition of the private placement," but makes no mention of any of the agreements described in Note 6.  (*Id.*).  Both Notes 4 and 6 were replicated in relevant part in Notes 4 and 5 of Defendant's Form 10-Q Filing for the quarter ending March 31, 2015.  (Sicignano Decl., Ex. 4).

federal court located in the State of New York for any disputes under this Agreement." (Sicignano Decl., Ex. 6 at 10; Peizer Decl., Ex. C at 10).

### d.    The Warrants

The four tranches of warrants specified in the Consulting Agreement were issued on September 29, 2014, and each tranche was "governed by a separate Warrant Agreement." (FAC ¶¶ 11-12). Implicated by the instant motion are the Tranche 1A Warrant and its Warrant Agreement. (*Id.* at ¶¶ 57-99).

The Tranche 1A Warrant Agreement (the "1A Agreement") entitled Plaintiff to purchase 1,250,000 "fully paid and non-assessable shares of [Defendant's] Common Stock" at any time on or after the Warrant's issuance date and before its Expiration Date,[8] upon Plaintiff's exercise of the Warrant. (Sicignano Decl., Ex. 7 at 1; Peizer Decl., Ex. B at 1). The procedures for such exercise are laid out in Section 1 of the 1A Agreement, and specified, among other things, that the Tranche 1A Warrant could be exercised in whole or in part through the delivery of a written notice and, further, that it was exercisable immediately upon its issuance. (*Id.* at 1-2).

The 1A Agreement also imposed a number of activity restrictions on its signatories, though it also indicated that the restrictions "shall not limit Holder's rights to enforce its rights or exercise its rights as to the Securities or under [the Tranche 1A] Warrant." (Sicignano Decl., Ex. 7 at 6; Peizer Decl.,

---

[8]    The 1A Agreement mandates that the Expiration Date is the second anniversary of the 1A Warrant's Issuance Date. (Sicignano Decl., Ex. 7 at 15; Peizer Decl., Ex. B at 15).

Ex. B at 6).  These restrictions included, as relevant here, obligations that Plaintiff "or any of its Affiliates" not "seek to advise or influence any Person with respect to any voting securities of [Defendant]" and not "engage or participate in any actions, plans, or proposals which relate to or would result in ... any change in the present board of directors or management of [Defendant], ... any other material change in [Defendant's] business or corporate structure, ... [or] any [similar] action, intention, plan or arrangement."  (*Id.*).

Section 12 of the 1A Agreement established that the Tranche 1A Warrant "shall be governed by and construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of Warrant shall be governed by, the internal laws of the State of New York." (Sicignano Decl., Ex. 7 at 12; Peizer Decl., Ex. B at 12).  In signing the 1A Agreement, "[e]ach of [Plaintiff] and [Defendant] [t]hereby irrevocably submit[ted] to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein."  (*Id.*).  The signatories further waived "irrevocably," and agreed "not to assert in any suit, action or proceeding, any claim that [they were] not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action, or proceeding is improper."  (*Id.*).

In several places, the 1A Agreement referenced the SPA.  Section 5, which outlined Plaintiff's exchange rights under the 1A Agreement, permitted Plaintiff to exchange "all or any portion of [the Tranche 1A] Warrant for fully paid and non-assessable shares of Common Stock" at any time and from time to time after the date sixty-one days following the execution of the SPA. (Sicignano Decl., Ex. 7 at 11; Peizer Decl., Ex. B at 11).  In Section 9, the parties agreed that notice required under the 1A Agreement would "be given in accordance with Section 9(f) of the [SPA]."  (Sicignano Decl., Ex. 7 at 8-9; Peizer Decl., Ex. B at 8-9).  And Section 15 provided that Plaintiff's remedies "available under this Warrant and any other agreement among the parties, at law or in equity, ... including any right of damages, [were] subject to Section 9(k) of the [SPA]."  (Sicignano Decl., Ex. 7 at 13; Peizer Decl., Ex. B at 13).[9]

### 4.     The Breakdown of the Parties' Relationship

The result of these contracts was to give Defendant a 51% ownership stake in the China JV and the power to appoint a majority of its five-person Board of Directors.  (FAC ¶ 22).  Plaintiff was a minority interest holder with a 25% equity interest in the venture.  (*Id.*).  In its Complaint, Plaintiff alleges that Defendant used this "control over [the China JV] to induce many breaches of the China JV Agreement."  (*Id.* at ¶ 28).  Among other grievances, Plaintiff faults Defendant for failing to form the requisite WFOE or "to accomplish other basic prerequisites" (*id.* at ¶¶ 29-34), which failures caused Defendant's stock

---

[9]     Notably, this provision contemplates that the SPA between the parties was to have been "of even date" with the 1A Agreement, though the two were ultimately executed 12 days apart.  (Sicignano Decl., Ex. 13 at 6; Peizer Decl., Ex. B at 13).

price to fall (*id.* at ¶ 36).  Defendant rejoins that the China JV stalled largely because Peizer "had vastly overstated his connections, experience and ability to help the China JV do business with China Tobacco."  (Def. Br. ¶ 8).  It further suggests that Plaintiff advised Defendant to act in violation of the Foreign Corrupt Practices Act, which Defendant refused to do.  (*Id.*).

As the parties' relationship soured, Peizer expressed his frustration in a series of emails sent to Defendant's senior executives and Board throughout the early months of 2015.  (FAC ¶ 43).  In these emails, Peizer demanded that the Board Chairman "step aside," warned investors of the market's "loss of confidence" in Defendant, and threatened to take various actions at shareholder meetings.  (*See* Sicignano Decl., Ex. 18 (listing and describing emails); *see also* Peizer Decl., Ex. D).  Plaintiff further alleges that in April 2015, it became aware that Defendant had begun "operating behind the scenes to take the China opportunity for itself and cut [Plaintiff] and Peizer out entirely."  (FAC ¶¶ 39-40).

On June 22, 2015, Defendant served Plaintiff with a notice of termination under the JV Agreement, "citing only the failure to secure a contract with CNTC as a basis."  (FAC ¶ 46).  Peizer allegedly attempted to salvage the China JV in July 2015, laying "out a strategy plan for success in China, and implor[ing] management to capitalize on the opportunity in China."  (*Id.* at ¶ 47).

Defendant took the position that Plaintiff had compromised its Exchange Right under the 1A Agreement.  (FAC ¶ 49).  To that end, on March 10, 2016,

Defendant informed Plaintiff that Peizer's 2015 emails "and a demand email by Mr. Peizer accusing [Defendant] of breach, constituted a breach of the 'Activity Restrictions' in the [1A Agreement]," which restrictions "generally prohibit[ed] [Plaintiff] from seeking Board representation or playing a public role in corporate governance." (*Id.*; *see also* Sicignano Decl., Ex. 18). Defendant accordingly refused to comply with its obligations under the 1A Agreement when Plaintiff sought to exercise its exchange rights in April and May 2016. (*See* FAC ¶¶ 51-55; *see also id.* at ¶ 56 (expressing intent to "continue to exercise the Exchange Right to obtain the full value of the Warrant within the time constraints set forth in the Warrant")).

## B.   Procedural Background

On April 26, 2016, Plaintiff initiated this action. (Dkt. #1). On May 19, 2016, Plaintiff filed the Complaint. (Dkt. #11).[10] The following day, Plaintiff moved for a preliminary injunction (i) requiring Defendant to deliver to Plaintiff the shares of common stock owed pursuant to Plaintiff's exercise of its Exchange Right as defined in the 1A Agreement and (ii) directing Defendant to comply with Plaintiff's future exercise of the 1A Agreement Exchange Right. (Dkt. #13-15). The Court issued an Order to Show Cause why it should not grant Plaintiff's requested injunctive relief. (Dkt. #12). Defendant filed its opposition to the Court's Order on June 1, 2016 (Dkt. #29-30), and Plaintiff filed its Reply on June 6, 2016 (Dkt. #31-32).

---

[10]   Plaintiff's amendment was proper as a matter of course because it was done within 21 days of service of the initial complaint. Fed. R. Civ. P. 15(a)(1).

On June 14, 2016, the Court heard oral argument regarding the proposed injunction.  (Dkt. #34).  After finding that venue was proper for purposes of Plaintiff's motion for injunctive relief, because Defendant waived arguments to personal jurisdiction under the terms of the 1A Agreement, the Court denied Plaintiff's motion.  (*Id.*).

Defendant filed its Motion to Sever and Transfer Counts I, VI, and VII to the United States District Court for the Western District of New York on July 11, 2016.  (Dkt. #36-37).  Plaintiff filed its opposition to Defendant's motion on July 29, 2016 (Dkt. #40), and Defendant filed its Reply on August 5, 2016.  (Dkt. #41).

## ANALYSIS

Resolving Defendant's motion to sever and transfer requires untangling a web of interrelated issues concerning the validity of the various forum selection clauses, their application, and their implications (if any) for this Court's venue analysis.  In the remainder of this Opinion, the Court considers (i) which, if any, of the contracts' forum selection clauses apply to Plaintiff's claims, and (ii) the extent to which any applicable forum selection clause impacts the propriety of venue in this District.

## A.    Issues Arising Under New York State Law

### 1.    Contract Interpretation

Plaintiff alleges that the various agreements discussed in the Factual Background constitute a single Finance Agreement and therefore must be read together.  (Pl. Opp. 3-4).  Because this integrated Finance Agreement does "not

contain a unitary forum selection clause, but rather is a network of integrated contracts, each containing its own forum selection clause," Plaintiff argues that the Court should analyze venue pursuant to 28 U.S.C. § 1391(b)(1) & (2), and find that venue is proper in the Southern District of New York.  (Pl. Opp. 1). Defendant disagrees, arguing that "the express terms of the China JV Agreement, the SPA[,] and the Tranche 1A Warrant all expressly refute [Plaintiff's] argument, because the[] agreements address different matters, do not incorporate the other agreements, and were executed at different times." (Def. Br. 10; *see also* Def. Reply 6).

The Court pauses to clarify at the outset that it does not here resolve the ultimate question of these contracts' interrelation, because doing so is both unnecessary for the resolution of Defendant's motion and premature at this early stage of litigation.  The Court takes up the question of the contracts' interrelatedness only to establish its unimportance to the Court's decision. Ultimately, the Court finds that whether these contracts constitute a single agreement or are (partly or fully) independent of one another, their respective forum selection clauses must be given force and Defendant's motion to sever and transfer Counts I, VI, and VII of the Complaint must be granted.

### 2.    Multiple Agreements and Potential Integration

Because (i) the relevant contracts specifically select New York law, (ii) both the Southern and Western Districts of New York are bound to apply the law of the state in which each court sits, and (iii) neither party has

disputed the applicability of New York law, the Court will analyze the parties'
contracts with regard to New York law.

Under New York law, the determination of "'[w]hether multiple writings
should be construed as one agreement depends on the intent of the parties,' …
which is typically a question of fact for the jury." *TVT Records* v. *Island Def
Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005) (first alteration in original)
(quoting *Commander Oil Corp.* v. *Advance Food Serv. Equip.*, 991 F.2d 49, 52-
53 (2d Cir. 1993)) (citing *Rudman* v. *Cowles Commc'ns, Inc.*, 330 N.Y.S.2d 33,
42 (1972)).  But where "the documents in question reflect no ambiguity as to
whether they should be read as a single contract, the question is a matter of
law for the court." *Id.*  In such unambiguous cases, "all writings which form
part of a single transaction and are designed to effectuate the same purpose
[must] be read together, even though they were executed on different dates and
were not all between the same parties." *Id.* (alteration in original) (internal
quotation marks omitted) (quoting *This Is Me, Inc.* v. *Taylor*, 157 F.3d 139, 143
(2d Cir. 1998)).

"The parties' intent is derived 'from the plain meaning of the language
employed in the agreements,'" *Madeleine, L.L.C.* v. *Casden*, 950 F. Supp. 2d
685, 695 (S.D.N.Y. 2013) (quoting *Crane Co.* v. *Coltec Indus., Inc.*, 171 F.3d
733, 737 (2d Cir. 1999)), and divining it "requires a court to 'give full meaning
and effect to all of [the contract's] provisions,'" *id.* (alteration in original)
(quoting *Katel Ltd. Liab. Co.* v. *AT & T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010)).
The Court must avoid "interpretations that render contract provisions

17

meaningless or superfluous." *Manley* v. *AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003).

That said, the fact that a contract constitutes

> an "integral part" of a larger transaction does not mean that any provision contained in [the contract] must be applied to all other documents that are part of the same transaction. ...  Parties are free to enter into multiple contracts as part of a single transaction without the provisions in one contract governing another contract.

*Rosen* v. *Mega Bloks Inc.*, No. 06 Civ. 3474 (LTS) (GWG), 2007 WL 1958968, at *5 (S.D.N.Y. July 6, 2007), *report and recommendation adopted in part*, No. 06 Civ. 3474 (LTS) (GWG), 2008 WL 2810208 (S.D.N.Y. July 21, 2008) (quoting 11 *Williston on Contracts* § 30:26 (4th ed.)).  In other words, even where a court considers several contracts as subparts of a single transaction, the court may still enforce the "express limitations in a particular agreement." *CFIP Master Fund, Ltd.* v. *Citibank, N.A.*, 738 F. Supp. 2d 450, 478 (S.D.N.Y. 2010) (citing *Coleman Co.* v. *Hlebanja*, 1997 WL 13189, at *7 (S.D.N.Y. Jan. 15, 1997) ("[E]ven if several contracts that constitute part of the same transaction are considered one contract, the different obligations within each contract may be independent and divisible[.]")).

## B.   The Enforceability and Applicability of the Forum Selection Clauses

The contracts implicated by Plaintiff's Complaint — the SPA, the JV Agreement, and the 1A Agreement — contain discrete forum selection clauses, though the JV Agreement differs in selecting the Western (as opposed to the Southern) District of New York.  Mindful of its obligations to give force to the intent of the contracting parties, as captured in the contracts' plain language,

the Court finds the clear intent of the parties to have been that disputes arising under each contract be adjudicated in the particular contracted-for forum.  The language of the relevant forum selection clauses is strong and unambiguous. Thus, the parties' intent and its obligation would persist even if the Court were to consider these contracts as comprising a single transaction.  Accordingly, the Court will apply each contract's forum selection clause to the extent that the clause is (i) enforceable, and (ii) applicable to each of Counts I, VI, and VII.

### 1.    Applicable Law

#### a.    Venue Generally

Venue in federal court is generally determined pursuant to 28 U.S.C. § 1391, which provides, in relevant part, that a civil action may be brought in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located" or "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b).  For all venue purposes, "an entity with the capacity to sue and be sued ... shall be deemed to reside, if a defendant, in any judicial district in which [it] is subject to the court's personal jurisdiction with respect to the civil action in question."  *Id.* § 1391(c)(2).  If an entity is a plaintiff, by contrast, it "shall be deemed to reside ... only in the judicial district in which it maintains its principal place of business."  *Id.*

#### b.    Curing Improper Venue

"[V]enue is proper so long as the requirements of § 1391(b) are met."  *Atl. Marine Constr. Co.* v. *U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. ___, 134 S. Ct.

568, 578 (2013).  If venue is improper in a particular district, "the case must be dismissed or transferred."  *Id.* at 577.  "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406(a).  Similarly, "[a] district court may dismiss a case on its own motion when venue is improper," though "a *sua sponte* dismissal is only appropriate in extraordinary circumstances." *Wenegieme* v. *Bayview Loan Servicing*, No. 14 Civ. 9137 (RWS), 2015 WL 2151822, at *4 (S.D.N.Y. May 7, 2015), *appeal dismissed* (Aug. 27, 2015). Significantly, "[i]n a case in which [a] plaintiff brings multiple claims, the general rule is that venue must be proper for each claim."  *Copeland* v. *U.S. Dep't of Justice*, No. 15 Civ. 3569 (VB), 2015 WL 12831710, at *2 (S.D.N.Y. Oct. 5, 2015).

### c.    Venue and Forum Selection Clauses

A forum selection clause cannot render otherwise proper "venue in a court 'wrong' or 'improper' within the meaning of § 1406(a)," but such a clause "may be enforced through a motion to transfer under § 1404(a)."  *Atl. Marine Const. Co.*, 134 S. Ct. at 579.  Section 1404(a) "provides [the] mechanism for enforcement of forum selection clauses" that, as here, "point to a particular federal district."  *Id.*  The provision allows that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district ... were it might have been brought."  28 U.S.C. § 1404(a).

As a general matter, § 1404 affords "wide latitude" for transfers.  *Bent* v.

*Zounds Hearing Franchising, LLC*, No. 15 Civ. 6555 (PAE), 2016 WL 153092, at

*3 (S.D.N.Y. Jan. 12, 2016) (citing *In re Cuyahoga Equip. Corp.*, 980 F.2d 110,

117 (2d Cir. 1992)).  Where the parties agree an action *could* have been brought

in the transferee district, the court must determine that transfer is an

appropriate exercise of its discretion.  *Id.* (quoting *Robertson* v. *Cartinhour*,

No. 10 Civ. 8442 (LTS) (HBP), 2011 WL 5175597, at *3 (S.D.N.Y. Oct. 28,

2011)).  Factors to consider include:

> [i] the convenience of witnesses; [ii] the convenience of
> the parties; [iii] the location of relevant documents and
> the relative ease of access to sources of proof; [iv] the
> locus of operative facts; [v] the availability of process to
> compel the attendance of unwilling witnesses; [vi] the
> relative means of the parties; [vii] the forum's familiarity
> with the governing law; [viii] the weight accorded the
> plaintiff's choice of forum; and [ix] trial efficiency and
> the interests of justice, based on the totality of the
> circumstances.

*Id.* (quoting *Robertson*, 2011 WL 5175597, at *4).  To decide a motion to

transfer, "a court may consider material outside of the pleadings."  *Garcia* v.

*Pearson Educ., Inc.*, No. 15 Civ. 7289 (KPF), 2016 WL 5921083, at *4 (S.D.N.Y.

Oct. 7, 2016) (internal quotation mark omitted) (quoting *Mohsen* v. *Morgan*

*Stanley & Co., Inc.*, No. 11 Civ. 6751 (PGG), 2013 WL 5312525, at *3 (S.D.N.Y.

Sept. 23, 2013)).

In cases involving forum selection clauses, however, a court's § 1404

calculus changes.  *See Atl. Marine Const. Co.*, 134 S. Ct. at 581 (quoting

*Stewart Org., Inc.* v. *Ricoh Corp.*, 487 U.S. 22, 31 (1988)).  This is because

parties who agree to a forum selection clause "waive the right to challenge the

preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* at 582.  In such cases, a court "must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Id.*  Because the court is left only to consider public-interest factors, "the practical result is that the forum-selection clauses should control except in unusual cases." *Id.*

Precisely for this reason, the Second Circuit has held that forum selection clauses are presumptively enforceable where the party moving under § 1404 can demonstrate that: (i) the clause was reasonably communicated to the party challenging enforcement; (ii) the clause is mandatory, rather than permissive, in nature; and (iii) the clause encompasses the plaintiff's claims. *Phillips* v. *Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007).  An opposing party must (iv) make a "sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching," to rebut this presumption.  *Martinez* v. *Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014) (quoting *Phillips*, 494 F.3d at 383-84 (quoting *M/S Bremen* v. *Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972))).

To decide "whether an otherwise mandatory and applicable forum clause is *enforceable*" at step four in this analysis, courts apply federal law.  *Martinez*, 740 F.3d at 217 (emphasis in original).  However, to answer "the *interpretive* questions posed by parts two and three of the four-part framework," courts will typically "apply the body of law selected in an otherwise valid choice-of-law clause." *Id.* at 217-18 (emphasis in original).  Here, neither party is arguing

that the forum selection clauses at issue were not communicated or that they are not mandatory.[11]  The Court focuses, therefore, on steps three and four.

As discussed above, step three is here analyzed according to New York state law, which makes clear that "the applicability of the forum selection clause does not turn on the type or nature of the dispute between the parties," but rather on the "express language" of the clause.  *Bernstein* v. *Wysoki*, 907 N.Y.S.2d 49, 55 (2d Dep't 2010); *accord Couvertier* v. *Concourse Rehab. & Nursing, Inc.*, 985 N.Y.S.2d 683, 684 (2d Dep't 2014).  Broad language indicating that a forum selection clause applies to any claim "arising out of a contract" has been interpreted to require the application of forum selection clauses to actions outside of contract law, such as to tort, personal injury, and products liability claims.  *See, e.g.*, *Couvertier*, 985 N.Y.S.2d at 683-84; *Tourtellot* v. *Harza Architects*, 866 N.Y.S.2d 793, 794-95 (3d Dep't 2008).

---

[11]   Were the Court required to reach the merits, it would find these clauses both reasonably communicated and mandatory.  A court can "easily" find a forum-selection clause to have been reasonably communicated for purposes of step one where, as here, the clause appears on the face of the contract the plaintiff has signed and is seeking to enforce.  *See Arial Techs. LLC* v. *Aerophile S.A.*, No. 14 Civ. 4435 (LAP), 2015 WL 1501115, at *3 (S.D.N.Y. Mar. 31, 2015).  With regard to step two, forum-selection clauses containing the parties' *irrevocable* submission to *exclusive* jurisdiction have been deemed "classically mandatory."  *Overseas Ventures, LLC* v. *ROW Mgmt., Ltd.*, No. 12 Civ. 1033 (PAE), 2012 WL 5363782, at *4 (S.D.N.Y. Oct. 26, 2012).  And the Second Circuit has recognized that the "combination" of a permissive forum selection clause and a waiver of an objection to venue "amounts to a mandatory forum selection clause at least where the plaintiff chooses the designated forum."  *S & L Birchwood, LLC* v. *LFC Capital, Inc.*, 752 F. Supp. 2d 280, 285 (E.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Aguas Lenders Recovery Grp.* v. *Suez, S.A.*, 585 F.3d 696, 700 (2d Cir. 2009)); *accord Akers Biosciences, Inc.* v. *Martin*, No. 14 Civ. 8241 (AJN), 2015 WL 1054971, at *4 (S.D.N.Y. Mar. 10, 2015).  The relevant clauses in the SPA, JV Agreement, and 1A Agreement dictate that the parties to each agreement submit irrevocably to the exclusive jurisdiction of a designated court or courts.  They are plainly mandatory.

Step four is governed by federal law, and the Supreme Court has made clear that a plaintiff's burden at this step is a heavy one.  *Bremen*, 407 U.S. at 19.  Indeed, in *Atlantic Marine Construction Company* v. *United States District Court for the Western District of Texas*, the Court stated that "[i]n all but the most unusual cases ..., 'the interest of justice' is served by holding parties to their bargain."  134 S. Ct. at 583.  However, the Second Circuit has recognized that "*Atlantic Marine* did not address the extent to which the 'interest of justice' test for invalidating a forum selection clause pointing to another federal district court resembles the test developed under *Bremen* for invalidating a forum selection clause pointing to a nonfederal forum[,]" though the later case did reaffirm "*Bremen*'s identification of a strong federal public policy supporting the enforcement of forum selection clauses."  *Martinez*, 740 F.3d at 219.  The Second Circuit thus continues to admonish district judges to "determine whether a forum selection clause is invalid under *Bremen*," and to do so "by examining four factors that, in effect, are four subparts that fall under the final prong of our four-part framework governing the effect of forum selection clauses."  *Id.* at 227-28.  Courts in this Circuit will "decline to enforce a forum selection clause under *Bremen* if: '[i] its incorporation was the result of fraud or overreaching; [ii] the law to be applied in the selected forum is fundamentally unfair; [iii] enforcement contravenes a strong public policy of the forum' in which suit is brought; 'or [iv] trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be deprived of his day in court.'"  *Id.* at 228 (quoting *Phillips*, 494 F.3d at 392).

### d.  Severance of Improperly Venued Counts

Procedurally, severance is a step preliminary to transfer in those cases where a court seeks to transfer only part of a larger action; because § 1404(a) "authorizes the transfer only of an entire action and not of individual claims," a court may properly sever certain claims, create "two or more separate 'actions,'" and then "transfer certain of such separate actions while retaining jurisdiction of others." *Wyndham Assocs.* v. *Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968). Severance is governed by Federal Rule of Civil Procedure 21, which permits courts to "sever any claim against a party."  Fed. R. Civ. P. 21.

"The decision [as to] whether to grant a severance motion is committed to the sound discretion of the trial court."  *Bent*, 2016 WL 153092, at *9 (alteration in original) (quoting *A & E Prods. Grp. L.P.* v. *The Accessory Corp.*, No. 00 Civ. 7271 (LMM), 2002 WL 1041321, at *1 (S.D.N.Y. May 23, 2002)). The *Bent* court further observed that

> [i]n considering a motion to sever, the Court must weigh several factors, including "[i] whether the claims arise out of the same transaction or occurrence; [ii] whether the claims present some common questions of law or fact; [iii] whether settlement of the claims or judicial economy would be facilitated; [iv] whether prejudice would be avoided if severance were granted; and [v] whether different witnesses and documentary proof are required for the separate claims."

*Id.* (quoting *Deajess Med. Imaging, P.C. ex rel. Barry* v. *Geico Gen. Ins. Co.*, No. 03 Civ. 7388 (DF), 2005 WL 823884, at *2 (S.D.N.Y. Apr. 7, 2005)) (alterations added).  "'Severance requires the presence of only one of these conditions,' although courts 'view severance as a procedural device to be

employed only in exceptional circumstances.'" *Dickerson* v. *Novartis Corp.*, 315 F.R.D. 18, 24-25 (S.D.N.Y. 2016) (quoting *Oram* v. *SoulCycle LLC*, 979 F. Supp. 2d 498, 503 (S.D.N.Y. 2013)).

Some courts have suggested "that the severance inquiry is different — and more focused on judicial efficiency — when it is combined with a section 1404 motion to transfer than when the severed case would remain in the original judicial district." *In re Rolls Royce Corp.*, 775 F.3d 671, 680 (5th Cir. 2014), *cert. denied sub nom. PHI Inc.* v. *Rolls Royce Corp.*, 136 S. Ct. 45 (2015) (collecting cases). The Fifth Circuit, for example, decided that "when considering a severance-and-transfer motion, the inquiry collapse[s] into an inquiry into the relative merits of convenience versus judicial economy." *Id.* The court went on to clarify that "[w]hile judicial economy is not the sole consideration for a district court facing a severance-and-transfer motion, it retains a cardinal role." *Id.* at 681. And while the Second Circuit has not yet addressed this exact question following *Atlantic Marine*, it has long affirmed its "strong policy favoring the litigation of related claims in the same tribunal in order that pretrial discovery can be conducted more efficiently[;] duplicitous litigation can be avoided, thereby saving time and expense for both parties and witnesses[;] and inconsistent results can be avoided." *Wyndham*, 398 F.2d at 619. To overcome this preference, a party moving for severance in this Circuit must show "that 'severance is required to avoid prejudice or confusion and to promote the ends of justice.'" *Dickerson*, 315 F.R.D. at 25 (quoting *N. Jersey*

*Media Grp. Inc.* v. *Fox News Network, LLC*, 312 F.R.D. 111, 114 (S.D.N.Y. 2015)).

### 2.     Venue in This District Is Improper with Regard to Counts I, VI, and VII

The parties do not dispute that venue is proper before this Court with regard to Counts II, III, IV, and V.  (Pl. Opp. 7).  As this Court found in connection with Plaintiff's motion for a preliminary injunction, venue is proper with regard to these claims because (i) Defendant consented to the Court's exclusive personal jurisdiction in the 1A Agreement's forum selection clause and (ii) these claims all arise from an alleged breach of the 1A Agreement. (Dkt. # 34).  Defendant was further deemed to reside in this District, because it was, by consent, "subject to the court's personal jurisdiction with regard to the civil action" then "in question."  *See* 18 U.S.C. § 1391(c).  Defendant is the only defendant in this litigation, which means that "all defendants are residents of the State in which the district is located"; venue is thus proper with regard to those claims to which the 1A Agreement's personal jurisdiction waiver applies. Plaintiff's Counts II, III, IV, and V fall within this category.

Plaintiff's § 1391 argument must go one step further though:  Plaintiff must argue that Defendant's consent to personal jurisdiction in the 1A Agreement with regard to "the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein" (Sicignano Decl., Ex. 7 at 12; Peizer Decl., Ex. B at 12), renders venue in this District proper for all seven claims in the Complaint.  The Court is not convinced.  If, as Defendant contends, Counts I, VI, and VII are properly viewed

as arising from the JV Agreement, rather than the 1A Agreement, then Defendant's 1A Agreement jurisdictional waiver would be irrelevant to the Court's determination of venue's propriety with regard to these counts. The Court proceeds to consider Defendant's contention.

The forum selection clause of the JV Agreement dictates that "any Proceeding arising out of or relating to [the JV] Agreement, the management and affairs of the [China JV] or any Contemplated Transaction shall be brought in the courts of the State of New York, County of Erie, or, if it has or can acquire jurisdiction, in the United States District Court for the Western District of New York." (Sicignano Decl., Ex. 1 at 45). It further recites that the JV Agreement signatories "irrevocably submit[] to the exclusive jurisdiction of each such court in any such Proceeding." (*Id.*). This "arising out of or relating to" language is exactly the language that New York has found to provide for broad applicability of a forum selection clause. And as detailed in the remainder of this section, the Court concludes that the JV Agreement's forum selection clause applies to Counts I, VI, and VII.

Considering first the text of the Complaint, Count I alleges that while "Plaintiff has fully performed its obligations under the Finance Agreement[,] Defendant has breached and repudiated its obligations under the Finance Agreement, both express and implied," which breach has damaged Plaintiff in an amount "believed to exceed the sum of $250 million." (FAC ¶¶ 58-60). Count VI alleges that Defendant, knowing of Plaintiff's JV Agreement with 22nd Century China, and with an intent "to disrupt that contract[,] ... improperly

caused 22nd Century Asia to breach that contract," and did so "with malice and intent to secure a benefit for [Defendant], at the expense of [Plaintiff], its joint venture partner, strategic investor and largest shareholder." (*Id.* at ¶¶ 90-92; *see also id.* at ¶¶ 93-94). Finally, in Count VII, Plaintiff seeks a permanent injunction to prevent Defendant "from wrongfully continu[ing] to pursue the sale and marketing of its tobacco products in China outside of the JV Agreement," in derogation of Plaintiff's exclusivity right in the JV Agreement. (*Id.* at ¶¶ 96-97).

Counts VI and VII clearly arise out of and relate to the JV Agreement: Count VI alleges a breach of the agreement and Count VII seeks an injunction to enjoin present and future breaches of the agreement. On this issue, the parties agree. (*See* Pl. Opp. 2 ("[I]t is true that Counts VI (tortious interference) and VII (permanent injunction) may 'arise' out of the China JV Agreement[.]"); Def. Reply 4). Arguably more attenuated to the JV Agreement is Count I, which alleges a violation of a larger "Finance Agreement" of which the JV Agreement is but one part. However, Plaintiff has carefully titled the count "Breach of Contract — Failure to Pursue the China Joint Venture" (FAC ¶¶ 57-60), and defines the breach as a "failure to pursue the China JV" (Pl. Opp. 6). And, of course, all of Defendant's obligations to pursue the China JV are laid out in (and only in) the JV Agreement.

The Court has considered whether the forum selection clauses in the SPA or the 1A Agreement — i.e., the two agreements selecting venue in this District — could apply to Count I, and has concluded in the negative. Both

forum selection clauses are more specific, and thus more limited, than the forum selection clause of the JV Agreement.  The SPA clause provides for the exclusive jurisdiction of courts in the City of New York, Borough of Manhattan, but only "for the adjudication of any dispute hereunder or under any of the other Transaction Documents or in connection herewith or therewith or with any transaction contemplated hereby or thereby or discussed herein or therein."  And the SPA itself does not mention any transactions related to the subsequent JV Agreement, Consulting Agreement, or 1A Agreement, or to the China JV more generally.  Thus a dispute over Defendant's alleged "failure to pursue the China JV" could not be said to be a dispute covered under the SPA. (Pl. Opp. 6).

The 1A Agreement's forum selection clause contains very similar language, providing for the exclusive jurisdiction of courts in the City of New York, Borough of Manhattan, "for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein."  (Sicignano Decl., Ex. 7 at 12; Peizer Decl., Ex. B at 12).  But like the SPA, the 1A Agreement makes no mention of the JV Agreement, Consulting Agreement, 1A Agreement, or China JV.  Its forum selection clause also does not apply to Count I.

Accordingly, venue in this District with regard to Counts I, VI, and VII is improper under § 1391.  Defendant's consent to personal jurisdiction under the 1A Agreement may provide for proper venue when the terms of that agreement are the subject of "the civil action in question," but where the

subject of the action is the alleged breach of a different agreement, the JV
Agreement, under which the parties consent to the personal jurisdiction of the
Western District of New York, there is no personal jurisdiction to give rise to
Defendant's residency, and thus no basis to support venue.  (*See* Def. Br. ¶ 12
("No activities relevant to the China JV claims occurred in or involved the
Southern District of New York.")).  And where venue is improper, the Court
must transfer or dismiss as required by § 1406.

### 3. The Forum Selection Clause of the JV Agreement Applies to Counts I, VI, and VII and Must Be Enforced

Even were the Court not required to transfer or dismiss Counts I, VI, and
VII on the basis of improper venue, it would be so required on the basis of the
JV Agreement's forum selection clause.  Using the analysis just described, the
Court finds that the forum selection clause in the JV Agreement applies to
Counts I, VI, and VII, and, further, that it was reasonably communicated to the
Plaintiff, is mandatory, and encompasses these three counts.  The burden
therefore shifts to Plaintiff to make a "sufficiently strong showing that
enforcement would be unreasonable or unjust, or that the clause was invalid."
*Martinez*, 740 F.3d at 221 (quoting *Phillips*, 494 F.3d at 383-84).

Making such a showing is no easy task, given the Supreme Court's
directive that forum selection clauses are to be "given controlling weight in all
but the most exceptional cases."  *Atl. Marine Const. Co.*, 134 S. Ct. at 579
(internal quotation marks omitted) (quoting *Stewart*, 487 U.S. at 33 (Kennedy,
J., concurring)).  And yet Plaintiff's argument at this fourth step is limited:
Plaintiff does not argue that the incorporation of the JV Agreement's forum

selection clause was the result of fraud or overreaching.[12]  Nor does Plaintiff claim that the law to be applied in the Western District of New York would be fundamentally unfair.  And Plaintiff does not claim that enforcing the forum selection clause contravenes a strong public policy of this Court, the forum in which suit was brought.

Plaintiff instead focuses on the hardship and prejudice that would result from the transfer of Counts I, VI, and VII to the Western District of New York. To succeed on this prong, Plaintiff must show that trial in this forum would be "so difficult and inconvenient that [Plaintiff] effectively will be deprived of [its] day in Court."  *Martinez*, 740 F.3d at 228 (quoting *Phillips*, 494 F.3d at 392). This Plaintiff surely has not done; Plaintiff alleges no prejudice stemming from transfer alone.

The prejudice arguments Plaintiff makes are bound up in its arguments opposing severance.  Plaintiff appears to argue that, the question of the applicability and enforceability of the forum selection clauses aside, this case should be resolved at the question of severance:  (i) Plaintiff's claims all arise from a common Finance Agreement; (ii) they present common issues of law or

---

[12]    To be clear:  While various of Plaintiff's allegations could arguably be construed to involve some manner of fraudulent misrepresentation, Plaintiff has in no way alleged that any forum selection clause was *itself* the product of fraud, as would be required. *See Scherk* v. *Alberto-Culver Co.*, 417 U.S. 506, 519 n.14 (1974) ("[F]orum-selection clauses 'should be given full effect' when 'a freely negotiated private international agreement [is] unaffected by fraud....'  This qualification does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable.  Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion." (internal citations omitted) (quoting *Bremen*, 407 U.S. at 12-13)).

fact because they stem from a single relationship, series of events, and network of contracts; (iii) severance will not facilitate settlement of the claims or judicial economy but would rather hinder it, because the resources of the parties and the Court would be expended, spread between, and wasted in "two parallel proceedings"; (iv) severance would not reduce prejudice but would rather increase it, because it would engender a risk of contrary and inconsistent outcomes; and (v) different witnesses and documentary proof are not required for the separate claims, but rather "similar witnesses and evidence." (Pl. Opp. 11-12).

Defendant responds that because the forum selection clauses are applicable and enforceable and the JV selection clause mandates the transfer of Claims I, VI, and VII, the Court must sever these claims and transfer them to the Western District of New York.  Moreover, Defendant disputes Plaintiff's severance analysis by arguing that (i) Plaintiff's claims do not arise from the same transaction or occurrence, because each of these contracts was executed and negotiated separately and there is no common Finance Agreement and (ii) "the determinative facts and issues" underlying Claims I, VI, and VII are "distinctly different" from the those underlying Claims II, III, IV, and V, because the former requires proof that the Defendant failed to perform under the JV Agreement and the latter requires a determination that the Plaintiff breached

the 1A Agreement's Activity Restrictions and thereby nullified the Exchange

Right.  (Def. Reply 9).[13]

Undertaking an independent evaluation of the severance factors, the

Court finds they neither favor nor disfavor severance:

(i)     On their face, Plaintiff's claims do not necessarily arise from the same transaction and occurrence. Plaintiff contends that there exists a Finance Agreement encompassing these discrete contracts, but has not provided the Court evidence of this.  The JV Agreement and 1A Agreement were executed by different parties. Claims I, VI, and VII require interpretation of the former, while Claims II, III, IV, and V require interpretation of the latter.

(ii)    Still, these claims could present common questions of law and fact, because they implicate the conduct of the same parties during the same time period.

(iii)   The Court cannot determine whether severance will facilitate settlement, but can clearly determine that it will hinder judicial economy. Any such hindrance, however, could be lessened by the careful pretrial management of the courts: one of the litigations could be stayed pending the resolution of the other, and/or the courts could coordinate discovery and motions practice.

(iv)    The likelihood of prejudice might be heightened by severance, to the extent that proceeding in multiple fora could advantage or disadvantage these parties according to their resources.  But such inconvenience is precisely the kind of private interest factor not to be considered where there is a forum selection clause.  Particularly where, as here, a different forum was selected for in a contract executed second in time, such private unfairness must be presumed to have

---

[13]   Defendant does not address factors (iii), (iv), or (v), though one may infer from its argument regarding the differences among Plaintiff's claims that Defendant would argue that there is at least some difference in the witnesses and evidence that would be required to resolved each severed count.

> been accounted for in the parties' bargain.  The Court remains attentive to the risk of inconsistent adjudication.  But this too the Court believes can be mitigated by coordination between fora.

> (v)  These claims are premised on the conduct of the same parties, which would need to be involved in both litigations following severance.  There is likely to be some overlap in documentary proof as well, though also some difference, given the existence of the different contracts.

The Court's neutral conclusion cannot trump the impropriety of venue in this District and the Supreme Court's mandate that forum selection clauses be enforced in all but the most "exceptional" circumstances.  There is a strong public interest in judicial economy, one that this Court takes seriously.  Yet there is also a strong public interest in the enforceability of contracts and the protection of the parties' expectations.  Courts have wrestled with these "centrifugal considerations" in the wake of *Atlantic Marine*, and opined that the tension between them could suggest that a "need — rooted in the valued public interest in judicial economy — to pursue the same claims in a single action in a single court can trump a forum-selection clause."  *In Re Rolls Royce Corp.*, 775 F.3d at 679; *see also Samuels* v. *Medytox Sols.*, Inc., No. 13 Civ. 7212 (SDW), 2014 WL 4441943, at *7-8 (D.N.J. Sept. 8, 2014) (disregarding *Atlantic Marine*'s instruction not to consider private interests where case involved two valid and conflicting forum selection clauses because "the parties [had] not unambiguously agreed to litigate in a particular forum as the parties did in *Atlantic Marine*").  Indeed, the Second Circuit cabined *Atlantic Marine* to its facts in a case involving a forum selection clause pointing to a foreign forum, because it found clauses of that type to "present distinct challenges not raised

by clauses that merely point to other federal district courts." *Martinez*, 740 F.3d at 230.

On the whole, courts have been loath to act contrary to the *Atlantic Marine* mandate.  *See, e.g.*, *Tulepan* v. *Roberts*, No. 14 Civ. 8716 (KBF), 2014 WL 6808313  (S.D.N.Y. Dec. 3, 2014) (enforcing forum selection clause despite the fact that a "factually related" suit was pending in another district); *Allianz Global Corp. & Specialty* v. *Chiswick Bridge*, Nos. 13 Civ. 7559 (RA), 13 Civ. 7565 (RA), 2014 WL 6469027, at *3 (S.D.N.Y. Nov. 17, 2014) (enforcing forum selection clause despite claims that litigating two "closely intertwined" matters in two fora would be "unduly costly and prejudicial"); *Carmouche Ins., Inc.* v. *Astonish Results, LLC*, No. 14 Civ. 00061 (SDD) (SCR), 2014 WL 2740464, at *6-7 (M.D. La. June 17, 2014) (finding plaintiff's "contention that there are conflicting choice of forum clauses that are unreasonably prejudicial and burdensome ... unpersuasive," noting plaintiff "could have avoided this dilemma if it had read and understood the contracts it signed," and granting defendant's motion to sever and transfer); *1-Stop Fin. Serv. Ctrs. of Am., LLC* v. *Astonish Results, LLC*, No. A13–CA–961–SS, 2014 WL 279669, at *6 (W.D. Tex. Jan. 23, 2014) (holding that while a potential "egregious waste of legal resources" and local interest were legitimate concerns, they did not "rise to a level sufficient to deny a motion to transfer").  The Court declines to do so here.

In sum, Plaintiff has not carried its burden at step four of the Court's § 1404 analysis.  And the Court does not find that this is a case where a forum selection clause ought not be enforced because its enforcement would create a

36

"palpable conflict," with another pending case, *Credit Suisse AG* v. *Appaloosa Inv. Ltd. P'ship*, No. 15 Civ. 3474 (SAS), 2015 WL 5257003, at *11 (S.D.N.Y. Sept. 9, 2015), or a "palpable inconvenience, ineconomy, and injustice," *Howmedica Osteonics Corp.* v. *Sarkisian*, Civ. A. No. 14-3449 (CCC), 2015 WL 1780941, at *3 (D.N.J. April 20, 2015).  Nor is this so large a case that the Court must find the forum selection clause could apply to too few of Plaintiff's claims to warrant their transfer.  *See Steinmetz* v. *McGraw-Hill Glob. Educ. Holdings, LLC*, No. 15 Civ. 6600, 2016 WL 7048951, at *5 (E.D. Pa. Dec. 5, 2016) (collecting cases).

Finally, the Court is concerned that limiting *Atlantic Marine* to its precise facts, to govern only in two-party cases to which only one forum selection clause applies, would allow "any clever party to a lawsuit" to plead around a valid forum selection clause.  *See In re Rolls Royce Corp.*, 775 F.3d at 685 (Jones, J., concurring).  The facts of this case do not justify this risk.  The Court will enforce the forum selection clause as required by federal law.  To give force to it, and to correct the impropriety of venue in this Court with regard to Counts I, VI, and VII, the Court will sever these counts and transfer them to the United States District Court for the Western District of New York.

## CONCLUSION

For the foregoing reasons, Defendants' motion to sever and transfer Counts I, VI, and VII is GRANTED.  The Court hereby severs Plaintiff's Claims I, VI, and VII of Plaintiff's Amended Complaint.  The Clerk of Court is directed to transfer Claims I, VI, and VII to the United States District Court for the

Western District of New York.  Litigation of Claims II, III, IV, and V will proceed in this District.   The Clerk of Court is further directed to terminate the motions at docket entries 18 and 36.

The parties are ORDERED to appear at an initial pretrial conference on **Friday, February 10, 2017, at 3:00 p.m**., in Courtroom 618 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York 10007.  On or before Thursday, February 2, 2017, the parties will submit a joint status letter and case management plan in accordance with Paragraph 3.B of the Court's Individual Rules of Practice in Civil Cases.

SO ORDERED.

Dated:       January 20, 2017
             New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge