UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                      :

CREDE CG III, LTD.,                   :
                                        :

                    Plaintiff,      :

                                          :

               v.                      :

                                          :

22ND CENTURY GROUP, INC.,    :
                                        :

                    Defendant.  :
                                          :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: December 28, 2017

16 Civ. 3103 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

This dispute arises out of an investment arrangement in which Plaintiff Crede CG III, Ltd. ("Crede") agreed to provide capital and other services to support the business interests of Defendant 22nd Century Group, Inc. ("22nd Century"). In return, Crede received, among other consideration, warrants giving it the rights to purchase 22nd Century stock or to exchange the warrants for 22nd Century stock. Among the terms of one of these warrants was a prohibition on Crede engaging in certain activities related to the organization of 22nd Century's Board of Directors. After Crede's principal sent a series of incendiary emails to 22nd Century Board members and shareholders, 22nd Century invoked the prohibition and declared that Crede's right to exchange the warrant for stock was null and void. Crede balked at this response, unsuccessfully attempted to exchange the warrants, and filed suit.

In a prior opinion, this Court severed certain of Crede's claims and transferred them to the United States District Court for the Western District of

New York.  *See Crede CG III, Ltd.* v. *22nd Century Grp., Inc.*, No. 16 Civ. 3103 (KPF), 2017 WL 280818 (S.D.N.Y. Jan. 20, 2017).  Before formal discovery could commence as to Crede's remaining claims, however, 22nd Century filed the instant motion for summary judgment.  For the reasons that follow, the Court grants in part, and denies in part, 22nd Century's motion.

BACKGROUND[1]

## A.    Factual Background

### 1.    The Parties

Crede is a Bermuda company with a principal place of business in Los Angeles, California.  (Peizer Decl. ¶ 2).  The company touts its "strong track record of identifying companies with high-growth potential and providing them with the capital needed to achieve their business objectives and create shareholder value."  (Pl. Opp. 2; *see also* Peizer Decl. ¶ 2).  Terren Peizer serves as the company's principal; as detailed herein, his communications with 22nd Century are at the heart of this litigation.  (Peizer Decl. ¶ 1).

22nd Century is a Nevada company with a principal place of business in Clarence, New York.  (Peizer Decl. ¶ 3).  The company focuses on plant biotechnology, and more specifically, the commodification of genetically-engineered tobacco products through "proprietary technology and plant

---

[1]    This Opinion draws from the parties' briefing, including 22nd Century's opening memorandum of law ("Def. Br." (Dkt. #53)), Crede's memorandum in opposition ("Pl. Opp." (Dkt. #56)), 22nd Century's Local Rule 56.1 Statement ("Def. 56.1" (Dkt. #54)), and Crede's Opposition to 22nd Century's Local Rule 56.1 Statement ("Pl. 56.1 Opp." (Dkt. #57)).  The declarations attached to this briefing on which the Court relies are referred to by the name of the declarant:  "Peizer Decl." (Dkt. #59), and "Fleming Decl." (Dkt. #58).  The Court also draws from the Amended Complaint ("Am. Comp." (Dkt. #11).

2

breeding expertise" that "allow it to regulate the levels of nicotine and nicotine alkaloids in the tobacco plant, thereby facilitating the growth of tobacco with reduced nicotine content." (Pl. Opp. 2). The company's securities trade on the New York Stock Exchange under the symbol "XXII." (Peizer Decl. ¶ 3).

### 2. The Contracts Between the Parties

In the summer of 2014, after taking an interest in 22nd Century's "products and its prospects for success in China," Peizer, on behalf of Crede, began negotiating the terms of a capital investment in the company. (Peizer Decl. ¶ 4). In September 2014, the parties entered into several contracts pursuant to which Crede was to provide financing and Peizer was to provide consulting services to 22nd Century, in exchange for certain equity interests in 22nd Century. (*See id.* at ¶¶ 4-7). Those contracts, executed at two closings that were 14 days apart, are outlined in the remainder of this section.

#### a. The September 15, 2014 Contract

##### i. The Securities Purchase Agreement

On September 15, 2014, the parties entered into a Securities Purchase Agreement (the "SPA"), whereby Crede agreed to purchase $10 million worth of 22nd Century's common stock. (*See* Pl. 56.1 Opp. ¶ 1; Def. 56.1 Ex. A). Crede's resulting equity stake in the company amounted to 3,871,767 shares valued at $2.58 per share. (Peizer Decl. ¶ 5). Section 4(d) of the SPA recited that 22nd Century would "use the proceeds from the sale of the Securities for general corporate purposes." (Def. 56.1 Ex. A, at § 4(d)). In § 9(e), the SPA contained a merger clause, providing that the SPA, "the [non-disclosure

agreement between the parties], the other Transaction Documents, the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein contain the entire understanding of the parties solely with respect to the matters covered herein and therein." (*Id.* at § 9(d)).[2]

### b. The September 29, 2014 Contracts

### i. The Shareholders Agreement

On September 29, 2014, the parties, along with Century Champion Investments, Ltd. ("Champion"), entered a Shareholders Agreement to form a new entity, 22nd Century Asia, Ltd. ("22nd Century Asia"). (Pl. 56.1 Opp. ¶ 2). The Shareholders Agreement purported to facilitate sales of 22nd Century's tobacco products to a state-owned tobacco company in China through 22nd Century Asia. (*See* Def. 56.1 Ex. B, at 1; Peizer Decl. ¶ 6). The parties to the agreement thus entered a joint venture (the "China Joint Venture") entitling the signatories to stakes in 22nd Century Asia through the Shareholder Agreement.

Specifically, the Shareholders Agreement stated,

> The parties agree that [22nd Century Asia] ... will use commercially reasonable, good faith efforts to secure a long-term contract with [China Tobacco International ("China Tobacco"), an affiliate of China National Tobacco Company,] or any entity controlled by China Tobacco in the People's Republic of China for the sale to that entity by [22nd Century Asia] of tobacco products

---

[2] The SPA defined "Transaction Documents" to cover the SPA, "the Registration Rights Agreement and each of the other agreements and instruments entered into or delivered by any of the parties hereto in connection with the transactions contemplated hereby and thereby, as may be amended from time to time." (Def. 56.1 Ex A, at § 3(b)).

> produced by [22nd Century] outside of the People's
> Republic of China[.]

(*See* Def. 56.1 Ex. B, at § 2.1(a).  In furtherance of this plan, the Shareholders

Agreement required 22nd Century to contribute $10 million to 22nd Century

Asia as a capital investment to form a wholly foreign-owned enterprise

("WFOE") in China to distribute 22nd Century's tobacco.  (*See id.* at 1).[3]  That

investment was contingent, however, on China Tobacco licensing "certain of

[22nd Century]'s intellectual property on a nonexclusive basis" at an aggregate

license fee of at least $8.4 million.  (*Id.* at § 2.6).  And "if the WFOE fail[ed] to

secure an acceptable contract with China Tobacco, the Company [would] be

wound up."  (*Id.* at 2).

Under the Shareholders Agreement, 22nd Century acquired a 51% stake

in 22nd Century Asia, Crede acquired a 20% stake in 22nd Century Asia, and

Champion acquired a 29% stake in 22nd Century Asia.  (*See* Def. 56.1 Ex. B,

at 2; *see also id.* at § 3.2(b)).[4]  In addition, the Shareholders Agreement granted

Crede certain management and distribution fees calculated as a portion of

---

[3]     Champion agreed to provide the Joint Venture with "all of the issued and outstanding equity of Vic Corporation Limited …, a company organized under the laws of Hong Kong," after which Vic Corporation would "be renamed '22nd Century Asia (Hong Kong) Ltd.'" and would become the WFOE.  (Def. 56.1 Ex. B, at 1).

[4]     Peizer's declaration states that "Crede … received a 25% interest in [the China Joint Venture]" (Peizer Decl. ¶ 6), but this is contrary to the terms of the Shareholders Agreement (*see* Def. 56.1 Ex. B, at 2 ("[I]mmediately prior to the signing of this Agreement, [22nd Century] has issued outstanding (a) 51 Class A Shares which were registered in the name of [22nd Century], (b) 20 Class B Shares which were registered in the name of Crede, and (c) 29 Class C shares which were registered in the name of Champion."), § 3.2(b) (establishing dividend and distribution issuance of "20% to Class B Shareholders, paid pro rata based on ownership of Class B Shares"), § 4.2 ("For so long as there are issued and outstanding 51 Class A Shares, 20 Class B Shares, and 29 Class C Shares … Class B Shares, as a class, shall be entitled to cast 20 votes (representing 20% of all votes) on all matters submitted to a vote by the shareholders.")).

shareholder dividends or distributions.  (*Id.* at §§ 2.9, 2.10).  The Shareholders

Agreement also envisioned further contracts between the parties whereby

Crede and Peizer would provide consulting services in exchange for rights to

acquire securities from 22nd Century:

> [22nd Century], Terren Peizer and Crede are entering into a consulting agreement relating to services to be performed for the Company that provides for the grant of warrants to acquire certain securities of [22nd Century], a portion of which vest upon revenue targets to be achieved by [22nd Century] from the sales of [its] tobacco to China Tobacco[.]

(*Id.* at 2).

## ii.    The Consulting Agreement

As the Shareholder Agreement anticipated, 22nd Century, Crede, and

Peizer entered a Consulting Agreement that required Crede

> to devote [its] efforts, business time and attention to providing consulting services to [22nd Century] related to [22nd Century]'s involvement in the China [Joint Venture] and maximizing the amount of proprietary tobacco of [22nd Century] that is purchased by the China [Joint Venture], with Peizer being the member-manager of [Crede] who will be primarily responsible for the performance of the duties of [Crede] under th[e] Agreement, but in no event will [Crede] be required to provide the services for more than five (5) hours in any week.

(Def. 56.1 Ex. C, at § 3).  The Consulting Agreement also provided that once

22nd Century, Crede, and Champion "executed documentation evidencing an

equity interest in 22nd Century Asia," i.e., the Shareholder Agreement, then

22nd Century would issue certain warrants to Crede, referred to as the

Tranche 1A Warrant, the Tranche 1B Warrant, the Tranche 2 Warrant, and the

Tranche 3 Warrant. (*Id.* at § 1). Collectively, the Warrants "covered 4.25 million shares of 22[nd] Century common stock at exercise prices ranging from $2.58 to $3.37 per share." (Peizer Decl. ¶ 6).

### iii. The Tranche 1A Warrant

This case revolves around Crede's attempted exercise of the Tranche 1A Warrant, under which Crede was entitled to purchase from 22nd Century 1,250,000 fully paid, non-assessable shares of Common Stock at an exercise price of $3.36 at any time on or after the Warrant's issuance date and before its expiration date. (*See* Def. 56.1 Ex. D, at 1, § 1(b)). Alternatively, Crede could exchange the Warrant for shares of common stock instead of cash, in part or in full, based on then-current market prices. (*See id.* at § 5). Crede was entitled to do so "at any time and from time to time from and after the date that is sixty-one (61) days after the closing of the purchase of shares of Common Stock by [Crede] pursuant to the [SPA] … and prior to the Expiration Date, by written notice to the Company." (*Id.* at § 5(a)). The first sentence of § 5 states that this Exchange Right is "subject to the limitations set forth in [§] 1(h)(ii)." (*Id.* at § 5).

In point of fact, the Warrant contains no § 1(h)(ii). 22nd Century maintains, and Crede contests, that this cross-reference leads to § 1(h), entitled "Activity Restrictions," which provides as follows:

> (i) For so long as [Crede] or any of its Affiliates holds any Warrants or any Warrant Shares, neither [Crede] nor any Affiliate will: (i) vote any shares of Common Stock beneficially owned by it, solicit any proxies, or seek to advise or influence any Person with respect to any voting securities of the Company; (ii) *engage or*

*participate in any actions, plans or proposals which relate to or would result in* (A) acquiring additional securities of the Company, alone or together with any other Person, which would result in [Crede] or its Affiliates beneficially owning (within the meaning of Section 13(d) under the 1934 Act) more than 9.9% of the Common Stock, (B) an extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving [22nd Century] or any of its Subsidiaries, (C) a sale or transfer of a material amount of assets of [22nd Century] or any of its Subsidiaries, (D) *any change in the present board of directors or management of [22nd Century], including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board,* (E) any material change in the present capitalization or dividend policy of [22nd Century], (F) *any other material change in [22nd Century]'s business or corporate structure*, including but not limited to, if [22nd Century] is a registered closed-end investment company, any plans or proposals to make any changes in its investment policy for which a vote is required by Section 13 of the Investment Company Act of 1940, (G) changes in [22nd Century]'s charter, bylaws or instruments corresponding thereto or other actions which may impede the acquisition of control of [22nd Century] by any Person, (H) causing a class of securities of [22nd Century] to be delisted from a national securities exchange or to cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association, (I) a class of equity securities of [22nd Century] becoming eligible for termination of registration pursuant to Section 12(g)(4) of the Act, or (J) *any action, intention, plan or arrangement similar to any of those enumerated above*; or (iii) request [22nd Century] or its directors, officers, employees, agents or representatives to amend or waive any provision of this paragraph. *The restrictions contained in this paragraph (h) shall not limit [Crede]'s rights to enforce its rights or exercise its rights as to the Securities or under this Warrant.*

(Def. 56.1 Ex. D, at § 1(h) (emphases added)).

The Tranche 1A Warrant also contained a choice-of-law clause providing that it "shall be governed by and construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Warrant shall be governed by, the internal laws of the State of New York." (Def. 56.1 Ex. D, at § 12). The same provision stated that each of Crede and 22nd Century "irrevocably waive[d] any right it may have to, and agree[d] not to request, a jury trial for the adjudication of any dispute hereunder or in connection with or arising out of this warrant or any transaction contemplated hereby." (*Id.* (emphasis omitted)).

### 3. The Peizer Emails

22nd Century claims that six emails from Peizer to 22nd Century breached the Activity Restrictions, and thus invalidated Crede's ability to exercise the Exchange Right. (*See* Def. Br. 5-7). Those emails are detailed in the remainder of this section.

### a. The February 18, 2015 Email

On February 18, 2015, Peizer sent an email with the subject line, "Why your stock is where it is, and heading lower," to James Cornell, 22nd Century's Board Chairman; Henry Sicignano, 22nd Century's President and Chief Executive Officer; and representatives of 22nd Century's investment bank. (Def. 56.1 Ex. H; *see* Pl. 56.1 Opp. ¶ 5). The email, as its title suggested, was critical of 22nd Century's efforts toward the China Joint Venture, stating that the company "botched China." (*Id.*). The email also complained that "no one in the company of the Board has ANY experience in the MicroCap space," and

that the Board "refuse[d] to listen to anyone," and "fail[ed] to communicate with [the] largest shareholder and most influential shareholder." (*Id.*). Peizer warned that if the Board did not "change the above immediately," the company's "stock will go lower ..., and change will necessarily come about." (*Id.*).

### b. The March 19, 2015 Email

Relations between the parties did not improve. On March 19, 2015, Peizer sent an email with the subject line, "Can't say I didn't warn you!!!" to Cornell and Sicignano. (Def. 56.1 Ex. I). The email criticized Cornell and his stature in the company, stating in relevant part,

> If you guys have any desire to create shareholder value something has to change. Jim [Cornell], don't be defensive, but be realistic. Part of the reason the stock is where it is[,] is that you're Chairman and you failed to get China done, and the shareholder base realizes you have no experience in anything that is [22nd Century]....

> The shareholder base wants a change. I don't want to be on your Board[,] let alone Chairman, but I have the support or your shareholder base[,] and only a change will convince [China National Tobacco Company] that something will be different.... If you want the stock to go up, and want the best deal of the company's existence, Jim, you must step aside....

> \* \* \*

> Jim, you really don't bring anything to the table and you have no expertise in any part of [22nd Century] and you have no capital invested. Shareholders and myself have huge losses[.] We can turn this around if you get out of the way[.] [D]o the right thing[.] And frankly I['d] rather put a proxy on the board and Chairman. But [China National Tobacco Company] was an amazing opportunity that you guys completely fucked up. Let's

discuss and let's create value[.]  The stock is [on] its way
to zero[.]"

(*Id.*).

### c.      The March 25, 2015 Email

On March 25, 2015, Peizer sent an email with the subject line "When will you guys learn????!!!!" to Cornell and Sicignano, copying 22nd Century's investment bankers.  (Def. 56.1 Ex. J; *see* Pl. 56.1 Opp. ¶ 7).  The email began by requesting that Cornell and Sicignano "forward [the email] to the rest of the Board as this is a communication meant for ALL members"; indeed, Peizer warned that he would "start communicating with the total Board in a more formal fashion shortly if things don't change."  (Def. 56.1 Ex. J).  Again, Peizer criticized the Board: "There isn't any public company expertise on the Board[.] There isn't any outside current operational management on the Board.  There isn't any capital markets expertise on the Board.  And the Board pays themselves with my money."  (*Id.*).

### d.      The April 9, 2015 Email

Peizer proved true to his word.  On April 9, 2015, he sent an email with the subject line, "Immediate Attention: Board of Directors of 22nd Century Group [I]nc.," to each member of 22nd Century's board, along with Sicignano. (Def. 56.1 Ex. K; *see* Pl. 56.1 Opp. ¶ 8).  In the email, Peizer continued to criticize the Board, stating, for instance, that "[w]hile Management and the Board may not be able to control the share price, Crede and other shareholders will hold it accountable for the wasteful spending that has resulted in no value creation."  (Def. 56.1 Ex. K).  He then added a thinly-veiled ultimatum:

> The Board Members don't have any unaffiliated capital invested, and have shown no inclination to act as fiduciaries, allowing Management to spend recklessly and wastefully. While it is clear that the Board lacks microcap market expertise (or they wouldn't be at odds with its entire Shareholder base and continue to ignore their interests), recognize that the company will need to raise capital. *Also realize that shareholder lawsuits are not conducive to that.* Recognize that fraud and malfeasance are not conducive to that. *I am going to give you until the close of business on Monday[,] April 24th to reply to the below email with actions, not words (something foreign to this Board). After which, you will only have communication from my lawyers, which will be publicly disclosed. The only thing that will create shareholder value at this point is a change in leadership or a discernible change in its approach.*

(*Id.* (emphases added)). The email concluded with Peizer threatening that unless he met "with authorized representatives of the company by April 24th, 2015[,] in a location convenient to [him], and [was] satisfied as to the course of action the Board and the company have determined to pursue, [he would] have no recourse but to pursue alternative publicly disclosed courses of action." (*Id.*).

### e. The April 10, 2015 Email

The following day, Peizer again emailed the entire 22nd Century Board and Sicignano, along with his counsel and 22nd Century shareholders and investment bankers. (*See* Def. 56.1 Ex. L; Def. Br. 6). After referencing his earlier "suggest[ions] that the Chairman step down," he reiterated his ultimatum:

> I don't care for lawsuits, or personally going after every Board Member personally for its outrageous actions that continue to undermine Shareholder value, cause shareholder losses, and continue to abrogate your

fiduciary duty; but [i]n my 35 years in the business I have never seen such abuses and egregious behavior. Guess what, my losses, shareholder losses are not effectively covered by your [director and officer] insurance[.] We will be alerting your carrier.

… There is a clear path to getting the company on track. You have until April 24th to convince me that things will change, and supported by actions not words. Given your collective inexperience in corporate governance, MicroCapital field, and knowing what you're dealing with in Crede Capital, you are soon to learn a very harsh lesson.

(Def. 56.1 Ex. L).

### f. The April 24, 2015 Email

On April 22, 2015, two days before Peizer's announced deadline, Cornell sent an email to Peizer, in which he responded to Peizer's demands and criticisms. (Def. 56.1 Ex. M). Cornell wrote, "[i]n specific response to two of your requests, I do not choose to resign as a Board Member or as Chairman, and [22nd Century] will decline your proposal for you to become a member of the Board of Directors at this time." (*Id.*). Further, Cornell reminded Peizer of the Activity Restrictions embedded in the warrants. (*See id.*).

Peizer replied two days later, on April 24, 2015, addressing an email to Cornell and Sicignano, as well as other business affiliates and 22nd Century shareholders. (*See* Def. 56.1 Ex. N; *see* Def. Br. 7). After explaining his efforts in the China Joint Venture and the failures that he perceived on the part of the Board, Peizer demanded that the Board members "exercise [their] fiduciary obligation and move this [Joint Venture] forward." (Def. 56.1 Ex. N). Failure to

do so, Peizer warned, would result in 22nd Century "squander[ing] the opportunity to pursue a transformative transaction for the company." (*Id.*).

### 4. 22nd Century's Notice of Breach to Peizer and Peizer's Attempt to Exchange the Tranche 1A Warrant

On March 10, 2016, 22nd Century's counsel sent Peizer a letter stating that several emails from Peizer to 22nd Century, sent between February 2015 and February 2016, including those discussed above, breached the Activity Restrictions. (*See* Def. 56.1 Ex. O). The letter contended further, "Crede's ability to exercise any Exchange Rights under Section 5 of the Tranche 1A Warrants is explicitly 'subject to'" the Activity Restrictions, and therefore "Crede's repeated and intentional violations of" the Activity Restrictions "renders those Exchange Rights null and void." (*Id.*).

In response, on April 26, 2016, Crede attempted to exercise its Exchange Rights by submitting to 22nd Century an Exchange Notice seeking to exchange 30,000 warrants for 77,555 shares of common stock. (*See* Peizer Decl. Ex. K). Two days later, on April 28, 22nd Century's counsel responded to the Exchange Notice, stating that the request was "null and void" for the reasons stated in the March 10 letter. (*Id.* at Ex. L). On May 17, 2016, Crede submitted an additional Exchange Notice, seeking 2,000,000 shares of 22nd Century stock in exchange for 700,828 warrants. (*Id.* at Ex. M).

### B. Procedural Background

Concurrent with its first attempt to exercise the Exchange Right on April 26, 2016, Crede filed the initial complaint in this action. (Dkt. #1). On May 19, 2016, two days after its second attempt, Crede filed an amended

complaint (Dkt. #11), and the following day, Crede moved for a preliminary injunction requiring 22nd Century to honor Crede's attempted exercise of its exchange rights and to comply with any future attempts by Crede to exercise its Exchange Rights (Dkt. #13-15). The Court then issued an Order to Show Cause why it should not grant the requested injunctive relief. (Dkt. #12). On June 14, 2016, the parties appeared for a hearing on the Order to Show Cause and the Court heard testimony from Peizer and Sicignano before denying Crede's motion. (*See generally* Dkt. #34).

On July 11, 2016, 22nd Century moved to sever Counts I, VI, and VII and transfer them to the United States District Court for the Western District of New York based on a forum-selection clause embedded in the Shareholder Agreement. (Dkt. #36-37). After receiving an opposition from Crede and a reply from 22nd Century, the Court granted the motion. (Dkt. #40-41, 43).

In its Opinion, the Court ordered the parties to file a case management plan on or before February 2, 2017; the date was later extended at the request of the parties. (Dkt. #43, 45). On March 20, 2017 — before undertaking any formal discovery — 22nd Century moved for summary judgment on the remaining counts, all of which are predicated on Crede's contention that 22nd Century had invalidly nullified its Exchange Right. (*See* Dkt. #52-54). Count II seeks "rescission of the SPA and the return of [the] $10 million" investment by Crede because, by "block[ing] [Crede] from exercising the Exchange right," 22nd Century "depriv[ed] [Crede] of the full value of its $10 million investment." (Am. Comp. ¶¶ 66, 70). Count III seeks declaratory judgment that Crede's

Exchange Notices are valid and that 22nd Century must honor them and any future valid Exchange Notices. (*See id.* at ¶¶ 71-73). Count IV seeks damages and alleges that 22nd Century breached the Warrant by refusing to honor Crede's Exchange Notices. (*Id.* at ¶¶ 74-81). And Count V seeks specific performance "requiring [22nd Century] to comply with the terms of the Tranche 1A Warrant." (*Id.* at ¶ 88). On May 1, 2017, Crede filed its opposition to 22nd Century's summary judgment motion (Dkt. #56-59), and on May 15, 2017, 22nd Century filed its reply (Dkt. #60). For the reasons that follow, the Court denies the motion as to all remaining counts except for Count II.

**DISCUSSION**

**A.      Applicable Law**

**1.      Summary Judgment**

Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (citation omitted). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party

and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citation omitted).

### 2. Canons of Contractual Interpretation

A court interpreting a contract must "give effect to the intent of the parties as revealed by the language of their agreement," while giving the contract's "words and phrases ... their plain meaning ... so as to give full meaning and effect to all of [the contract's] provisions." *Chesapeake Energy Corp.* v. *Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 113-14 (2d Cir. 2014) (quoting *Olin Corp.* v. *Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012); *Compagnie Financiere de CIC et de L'Union Europeenne* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)). Under New York law, which applies under the agreements at issue, "[i]t is well settled that a contract must be read as a whole to give effect and meaning to every term" and "in a way [that] reconciles all [of] its provisions, if possible." *Maven Techs., LLC* v. *Vasile*, 46 N.Y.S.3d 720, 722 (4th Dep't 2017) (quoting *N.Y. State Thruway Auth.* v. *KTA-Tator Eng'g Servs., P.C.*, 913 N.Y.S.2d 438, 440 (4th Dep't 2010)). Indeed, "[i]n construing a contract, a court should read the contract as a whole and avoid any interpretation that would render a contractual provision without force and effect." *Luitpold Pharm., Inc.* v. *Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (internal citations omitted) (construing New York law).

"[W]hen parties set down their agreement in a clear, complete document, their writing should … be enforced according to its terms.  Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *W.W.W. Assocs., Inc.* v. *Giancontieri*, 77 N.Y.2d 157, 162 (1990).  "Only when a court finds ambiguity in the parties' written agreement may it look to extrinsic evidence to discern the parties' intent." *Luitpold Pharm., Inc.*, 784 F.3d at 87. A contract is ambiguous "if its terms 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Chesapeake Energy Corp.*, 773 F.3d at 114 (quoting *Law Debenture Tr. Co. of N.Y.* v. *Maverick Tube Corp.,* 595 F.3d 458, 465 (2d Cir. 2010)).  Conversely, "[n]o ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (quoting *Maverick Tube Corp.,* 595 F.3d at 467).

A summary judgment motion involving contractual interpretation thus involves two steps:  "First, a court must determine, as a matter of law, whether the disputed contractual terms are ambiguous." *Great Minds* v. *John Wiley & Sons, Inc.*, 204 F. Supp. 3d 507, 511 (S.D.N.Y. 2016) (citing *Maverick Tube Corp.,* 595 F.3d at 465).  Second, if the court finds no ambiguity, it interprets

18

the contract according to its "plain meaning." *Id.* at 512. But if the court finds ambiguity, "'where there is relevant extrinsic evidence of the parties' actual intent,' then the contract's meaning becomes an issue of fact precluding summary judgment." *Sayers* v. *Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) (quoting *Seiden Assocs., Inc.* v. *ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir. 1992)). The moving party thus bears the burden of proving that its proffered construction is the contract's only fair construction. *Vasile*, 46 N.Y.S.3d at 722 (quoting *Nancy Rose Stormer, P.C.* v. *Cty. Of Oneida*, 886 N.Y.S.2d 298, 299 (4th Dep't 2009)).

**B.    Analysis**

The instant motion requires the Court to answer two related questions: *First*, does the record present triable issues of fact as to whether Peizer, in his capacity as Crede's principal, breached the Activity Restrictions under the Tranche 1A Warrant? *Second*, if so, does the record present triable issues of fact as to whether such breach excused 22nd Century from honoring Crede's Exchange Rights under the Warrant? The Court answers the first question in the negative and the second in the affirmative: Peizer breached the Activity Restrictions as a matter of law, but the Warrant is ambiguous as to whether such breach excused 22nd Century from honoring Crede's Exchange Rights, and whether the parties intended this result raises a genuine dispute of material fact.

The Court must then answer a third question that exists independent of the first two: May Crede rescind the SPA based on 22nd Century's alleged

breach of the Tranche 1A Warrant?  The Court answers this question in the negative.  Because the SPA and Tranche 1A Warrant are not an integrated contract, Crede may not rescind the SPA even if 22nd Century breached the Warrant.

### 1.    No Reasonable Jury Could Find That Crede Did Not Breach the Activity Restrictions

Crede urges the Court to read § 1(h) of the Tranche 1A Warrant to prohibit "only … substantial activity designed to effectuate major changes in corporate governance, essentially hostile takeover activity." (Pl. Opp. 18).  The unambiguous language of § 1(h), however, proscribes a much broader variety of activities, including so much as an "intention" to take "any actions" that "relate to … any change" in the organization of 22nd Century's management.  It reads in pertinent part:

> For so long as [Crede] or any of its Affiliates holds any Warrants or any Warrant Shares, neither [Crede] nor any Affiliate will … engage or participate in any actions, plans or proposals which relate to or would result in … any change in the present board of directors or management of [22nd Century], including any plans or proposals to change the number or terms of directors or to fill any existing vacancies on the board, … any other material change in [22nd Century]'s business or corporate structure, … or … any action, intention, plan or arrangement similar to any of those enumerated above.

(Def. 56.1 Ex. D, at § 1(h)).

Crede contends that § 1(h) should incorporate the standard applicable to disclosure requirements under § 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d), and its corresponding regulation, Schedule 13D, 17 C.F.R.

§ 240.13d-101. (*See* Pl. Opp. 18-19). Crede grounds this proposition in

similarity between the language in § 1(h) and that in Item 4 of Schedule 13D.[5]

As noted, however, "extrinsic evidence cannot be used to create an ambiguity

in what is otherwise an unambiguous contract." *Bast Hatfield, Inc.* v. *Gen.*

---

[5]     Item 4 reads as follows:

> Item 4. Purpose of Transaction. State the purpose or purposes of the acquisition of securities of the issuer. Describe any plans or proposals which the reporting persons may have which relate to or would result in:
>
> (a) The acquisition by any person of additional securities of the issuer, or the disposition of securities of the issuer;
>
> (b) An extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the issuer or any of its subsidiaries;
>
> (c) A sale or transfer of a material amount of assets of the issuer or any of its subsidiaries;
>
> (d) Any change in the present board of directors or management of the issuer, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board;
>
> (e) Any material change in the present capitalization or dividend policy of the issuer;
>
> (f) Any other material change in the issuer's business or corporate structure, including but not limited to, if the issuer is a registered closed-end investment company, any plans or proposals to make any changes in its investment policy for which a vote is required by section 13 of the Investment Company Act of 1940;
>
> (g) Changes in the issuer's charter, bylaws or instruments corresponding thereto or other actions which may impede the acquisition of control of the issuer by any person;
>
> (h) Causing a class of securities of the issuer to be delisted from a national securities exchange or to cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association;
>
> (i) A class of equity securities of the issuer becoming eligible for termination of registration pursuant to section 12(g)(4) of the Act; or
>
> (j) Any action similar to any of those enumerated above.

17 C.F.R. § 240.13d-101.

*Elec. Co. on Behalf of Knolls Atomic Power Lab.*, 646 N.Y.S.2d 210, 212 (3d Dep't 1996).

But even looking beyond the four corners of the Warrant, a comparison with Schedule 13D only serves to underscore the breadth of § 1(h). Crucially, whereas Schedule 13D requires disclosing "[a]ny action similar to any" of the activities enumerated therein, the ostensibly corresponding paragraph in § 1(h) of the Warrant prohibits Crede or its affiliates from engaging or participating in "any action, *intention, plan or arrangement* similar to any" of the activities enumerated therein. The Court therefore construes § 1(h), as it should, with due reference to its "plain meaning" and without regard to disclosure requirements under 15 U.S.C. § 78m(d). *Chesapeake Energy Corp.*, 773 F.3d at 113-14.

Given this reading of the Warrant, several of Peizer's emails plainly transgressed § 1(h). For starters, his March 19, 2015 email explicitly demanded that Cornell, the chairman of 22nd Century's Board, "step aside," and the email threatened that Peizer would "rather put a proxy on the board and [in place of] the Chairman" than, presumably, have Cornell continue to serve as Chairman. (Def. 56.1 Ex. I). Indeed, in a later email, Peizer explicitly referenced his earlier "suggest[ions] that the Chairman step down." (Def. 56.1 Ex. L). On April 9, 2015, Peizer sent another email to the entirety of 22nd Century's Board, implicitly threatening a "shareholder lawsuit[]" or other "publicly disclosed" "communication from [his] lawyers" unless the company achieved "a change in leadership or a discernible change in its approach." (Def.

56.1 Ex. K).  These passages put the lie to Crede's argument that Peizer's emails simply "reflect[ed] the fact that [he was] engaged in a broader discussion regarding the China [Joint Venture] or improving the Company generally."  (Pl. Opp. 19).  They instead reveal an intention to disrupt 22nd Century's management if the Board did not do so of its own accord.

Crede also contends that the sentiments conveyed through Peizer's emails were "precisely [the] type of business advice" that 22nd Century had "bargained for and solicited ... in retaining Mr. Peizer as a consultant."  (Pl. Opp. 20).  But the Consulting Agreement and the Activity Restrictions are reconcilable without reading the former to allow Peizer to flout the latter. Indeed, the Consulting Agreement had nothing to do with 22nd Century's management and everything to do with Peizer serving as an intermediary between 22nd Century and his contacts in China:  The second paragraph of the Consulting Agreement provides, "the Consultant [Peizer] arranged for meetings and introductions between the Company and various representatives of the tobacco industry in the people's Republic of China ... that occurred in June 2014," and the paragraph defining the services Peizer would provide states that he would "devote ... efforts, business[,] time and attention to providing consulting services to the Company related to the Company's involvement in the China [Joint Venture] and maximizing the amount of proprietary tobacco of the Company that is purchased by the China [Joint Venture.]"  (Def. 56.1 Ex. C, at 1).  The Consulting Agreement contains no

mention of Peizer being involved with 22nd Century's management, much less spouting harsh criticism in the face of the Activity Restrictions.

Even viewing Peizer's emails and the Activity Restrictions in Peizer's favor, a reasonable jury could not find that his communications did not manifest at least the forbidden "intention" to take "any actions" that "relate to … any change" in the organization of 22nd Century's management. Thus, having found that Crede breached the Activity Restrictions, the Court will next consider whether this breach allowed 22nd Century to refuse to honor Crede's attempted exercise of its exchange rights under the Tranche 1A Warrant.

2. **A Genuine Dispute of Material Fact Remains as to Whether Crede's Breach of the Tranche 1A Warrant Excused 22nd Century from Honoring Crede's Exchange Rights**

The first sentence of § 5 of the Tranche 1A Warrant, which establishes and defines Crede's Exchange Rights, provides, "In addition to the rights of [Crede] under Section 1 hereof, this Warrant shall be exchangeable by [Crede] on a cashless basis as further set forth below (*and subject to the limitations set forth in Section 1(h)(ii) hereof*)." (Def. 56.1 Ex. D, at § 5 (emphasis added)). 22nd Century maintains that this cross-reference to § 1(h)(ii) renders Crede's Exchange Rights subject to compliance with § 1(h)'s Activity Restrictions. Crede counters that § 1(h) does not contain a section corresponding to the cross-reference, and, even if § 1(h) does apply to its Exchange Rights under § 5, a disclaimer contained in the last sentence of § 1(h) allows Crede nonetheless to exercise its Exchange Rights. The Court concludes that, based on the pre-discovery record before it, the operative language creating an interplay

between § 5 and § 1(h) is ambiguous, and 22nd Century has failed to bring forth extrinsic evidence showing that "its construction of the" Tranche 1A Warrant "is the only construction [that] can be fairly placed thereon." *Vasile*, 46 N.Y.S.3d at 1378 (quoting *Nancy Rose Stormer,* 886 N.Y.S.2d at 299).

### a. The Record Presents a Genuine Dispute of Material Fact as to Whether the Parties Intended § 5 to Be "Subject to" the Activity Restrictions in § 1(h)

To begin, Crede is correct that the Tranche 1A Warrant does not contain a § 1(h)(ii). Instead, curiously, it contains a § 1(h)(i) with three subsections: §§ 1(h)(i)(i), 1(h)(i)(ii), and 1(h)(i)(iii). (*See* Def. 56.1 Ex. D, § 1(h)). Whether the parties intended the first sentence in § 5 to refer to a specific subsection of § 1(h) is thus ambiguous absent further indications of the parties' intent from the face of the Warrant. *Cf. Adria Intern. Grp., Inc.* v. *Ferre Dev., Inc.*, 241 F.3d 103, 109-10 (1st Cir. 2001) (holding, under Puerto Rican law, that reference to "Initial Option Period as … defined in Article Third (a) of the Deed," where "Article Third (a) sp[oke] only of an 'exclusive, irrevocable first option,'" but Article Third (b) of the Deed defined "Initial Option Period," was "a typographical error with no import" because "'Initial Option Period' was a term of art used throughout the deed"). Were the Court to read "§ 1(h)(ii)" to mean "§ 1(h)(i)(ii)," it would improperly rewrite the contract "under the guise of interpreting the writing." *Reiss* v. *Fin. Performance Corp.*, 97 N.Y.2d 195, 191 (2001) (quoting *Schmidt* v. *Magnetic Head Corp.*, 468 N.Y.S.2d 649, 654 (2d Dep't 1983)). Furthermore, the Court notes that 22nd Century has not

explained why § 5 would, by its own terms, be subject only to a subsection of § 1(h) and not § 1(h) in its entirety.

Given this ambiguity, the Court proceeds to consider Crede's extrinsic evidence suggesting that the parties may have intended § 5 to refer to, and thus be limited by, § 1(i) instead of § 1(h)(ii). And indeed, § 1(i) of the Warrant contains an express restriction on Crede's Exchange Rights under § 5:

> Provided that no Equity Conditions Failure then exists with respect to clauses (ii) or (iii) of the definition of Equity Conditions, if the trading price on the Principal Market at the time of an exercise of this Warrant is greater than the then applicable Exercise Price then in effect, then in respect of such particular exercise [Crede] may only exercise this Warrant for a cash exercise price (and not by means of a Cashless Exercise under [§] 1(d) above *or on a cashless basis under [§] 5 below). For avoidance of doubt, provided that the conditions in this [§] 1(i) are satisfied at such time, no cashless exercises or exchanges (under [§] 5) may occur.*

(Def. 56.1 Ex. D, § 1(i) (emphasis added)).[6] The language of § 1(i) links to extrinsic evidence Crede submits in support of its argument.

In an attempt to put flesh on the bones of § 5's cross-reference, Crede offers extrinsic evidence consisting of the Declaration of Thomas J. Fleming, its outside counsel, and prior contracts to which Crede was a party. (*See generally* Fleming Decl.). First, Crede submits an unsigned Warrant Agreement between Crede and FreeSeas Inc., which (according to Fleming) FreeSeas issued in May 2014, contained substantially similar terms to the Tranche 1A

---

[6] The Tranche 1A Warrant defines "Equity Conditions Failure" to mean "that on any applicable date of determination, any of the Equity Conditions are not then satisfied." (Def. 56.1 Ex. D, § 17(g)).

Warrant, including a § 5 entitled "Exchange Rights" that was also "subject to the limitations set forth in [§] 1(h)(ii) hereof." (Fleming Decl. Ex. B, at § 5; *see also id.* at ¶ 7). But, as opposed to the Tranche 1A Warrant, § 1(h) of the FreeSeas Warrant, entitled "Activity Restrictions," contains a subsection, § 1(h)(i), reflecting the Activity Restrictions as presented above, *along with* § 1(h)(ii) reflecting the Equity Conditions presented above. (Fleming Decl. Ex. B, at § 1(h)). Separately, Crede submits a Warrant to Purchase Common Stock between it and ZaZa Energy Corporation, issued on July 21, 2014. (Fleming Decl. Ex. A). This Warrant contains the same relevant language as the Tranche 1A Warrant — § 5 references a nonexistent § 1(h)(ii), with the Activity Restrictions appearing in § 1(h) and Equity Conditions in § 1(i). (*See id.*). Fleming's declaration provides, "[t]his is a typographical error that was carried over to the Tranche 1A Warrant." (Fleming Decl. ¶ 6). Viewed in Crede's favor, this evidence presents a genuine dispute of material fact as to whether the parties intended § 5 to refer to the Activity Restrictions in § 1(h) or, alternatively, whether the reference to § 1(h)(ii) is a typographical error.

> **b.** **The Activity Restrictions' Disclaimer Is Ambiguous and the Parties Have Not Provided Relevant Extrinsic Evidence**

The final sentence of § 1(h) provides an apparent disclaimer as to the effects of a violation of that section: "*The restrictions contained in this paragraph (h) shall not limit [Crede]'s rights to enforce its rights or exercise its rights as to the Securities or under this warrant.*" (Def. 56.1 Ex. D, at § 1(h) (emphasis added)). Here, too, the parties advance competing interpretations of

the relevant language: 22nd Century maintains that the Court should interpret this provision "to mean that violations of the Activity Restrictions would still allow [Crede] *to exercise* its warrants under [§] 1 by paying for 22nd Century stock, and *to enforce* its other rights under the Tranche 1A Warrant," but it would not allow "a continuing right *to exchange* the warrants under [§] 5 after violation of the activity restrictions." (Def. Br. 15-16). Crede provides a much simpler reading: "The only conceivable reading of this sentence is that, regardless of a violation [of the Activity Restrictions], Crede may exercise or enforce *any* rights under the Tranche 1A Warrant, including the Exchange Right." (Pl. Opp. 9-10). Given these competing interpretations, the disclaimer's terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person" and thus render the Disclaimer ambiguous. *Chesapeake Energy Corp.*, 773 F.3d at 114 (quoting *Maverick Tube Corp.,* 595 F.3d at 465).

For 22nd Century's part, the Disclaimer's use of "exercise" and not "exchange" suggests that violations of the Activity Restrictions might not preclude Crede from invoking its Exercise Rights as opposed to its Exchange Rights. *See Md. Cas. Co.* v. *W.R. Grace & Co.,* 128 F.3d 794, 799 (2d Cir. 1997) ("Terms in a document … normally have the same meaning throughout the document in the absence of a clear indication that different meanings were intended."), *as amended* (Nov. 18, 1997). In other words, by using the word "exercise" to the exclusion of "exchange," the parties may have intended to refer to those terms as the contract uses them in other sections. 22nd Century also

points out that because Crede's Exchange Right entitled it to acquire portions of common stock depending on then-current stock prices (as opposed to the fixed cash price of the Exercise Right), Crede could have an incentive to engage in activity that would depress the stock price in order to obtain a larger portion of shares, thus providing a rationale as to why the Disclaimer might apply to the Exchange but not the Exercise Right. 22nd Century's interpretation, however, is tethered to its argument that § 5 is expressly "subject to" § 1(h) — which argument, as discussed above, the Court cannot decide as a matter of law.

Crede, conversely, reads the phrase "exercise its rights or enforce its rights" to include the ability to exercise its Exchange Rights. (*See* Pl. Br. 10). The plain meaning of the terms suggests that this broad interpretation is at least plausible. *See* Exercise, *Black's Law Dictionary* (10th Ed. 2014) ("To make use of; to put into action[.] To implement the terms of; to execute[.]"). Moreover, the Exchange Notice by which Crede was to exchange warrants for stock (attached as an exhibit to the Tranche 1A Warrant) utilizes the precise language 22nd Century attempts to distinguish from "exchange," providing that "[t]he undersigned holder hereby *exercises the right to exchange the Warrant* to purchase Common Stock." (Def. 56.1 Ex. D, at Ex. B (emphasis added)). Crede's view also would not render § 1(h) meaningless; under this interpretation, 22nd Century could still seek damages or equitable relief for violations of § 1(h). *See Town of Eden* v. *Am. Ref-Fuel Co. of Niagara*, 727 N.Y.S.2d 843, 846 (4th Dep't 2001) ("Effect and meaning must be given to every

term of the contract" and "the contract must be interpreted so as to give effect to, not nullify, its general or primary purpose." (internal citations omitted)).

To be sure, the terms of a contract are "not ambiguous merely because the parties urge different interpretations in the litigation." *Metro. Life Ins. Co.* v. *RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). But the parties' interpretations of the Activity Restrictions' Disclaimer are both objectively reasonable, thus rendering the Disclaimer ambiguous and precluding summary judgment. *See Great Minds*, 204 F. Supp. 3d at 512 ("[I]f a court finds that the contractual language is ambiguous, then it should typically deny summary judgment." (citing *Compagnie Financiere de CIC et de L'Union Europeenne* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.,* 232 F.3d 153, 158 (2d Cir. 2000)).

### 3. Crede's Claim to Rescind the SPA Based on a Breach of the Tranche 1A Warrant Fails as a Matter of Law

Finally, the Court must consider whether 22nd Century is entitled to judgment as a matter of law on Crede's rescission claim, which alleges that by dishonoring Crede's Exchange Rights, 22nd Century "substantially defeated the purpose and objective of the SPA," entitling Crede "to rescission of the SPA and the return of $10 million." (Compl. ¶¶ 67, 70). The Court need not repeat here why the record does not establish as a matter of law that 22nd Century was entitled to dishonor Crede's Exchange Rights, for even assuming 22nd Century breached the Tranche 1A Warranty, Crede would not be entitled to rescind the separate, independently-enforceable SPA.

Under New York law, "rescission of a contract is permitted for such breach as substantially defeats its purpose. It is not permitted for a slight, casual, or technical breach, but ... only for such as are material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Ma* v. *Biaggi*, 54 N.Y.S.3d 46, 47 (2d Dep't 2017) (quoting *Matter of Kassab* v. *Kasab,* 27 N.Y.S.3d 680, 683 (2d Dep't 2016)). A party may not rescind a contract based on the breach of a separate agreement that is not "interdependent or somehow combined" with the former contract such that the two "form a unitary contract." *Applehead Pictures LLC* v. *Perelman*, 913 N.Y.S.2d 165, 172 (1st Dep't 2010) (holding that two separately executed contracts were not integrated and thus breach of one contract did not constitute breach nor allow rescission of other contract). "Whether a number of promises constitute one contract or more than one is to be determined by inquiring whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatsoever, if any promise or set of promises were struck out." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 731 (S.D.N.Y. 1989) (quoting *United States* v. *Bethlehem Steel Corp.,* 315 U.S. 289, 298 (1942)).

Here, the SPA and Tranche 1A Warrant did not combine to form a unitary contract, and thus, as a matter of law, Crede is not entitled to rescind the SPA based on a breach of the Warrant. The purpose of the SPA (executed two weeks *before* the Warrant) was to facilitate the sale of $10 million in 22nd Century common stock to Crede. By way of comparison, per the terms of the

Consulting Agreement, the Tranche 1A Warrant served as consideration for Crede (among other parties) to take an equity interest in 22nd Century Asia, and thereby further the parties' efforts toward the China Joint Venture. The contracts therefore evince separate purposes and in no way refer to one another. *See Perelman*, 913 N.Y.S.2d at 172 ("[S]eparate written agreements involving different parties, serving different purposes and not referring to each other [are] not intended to be interdependent or somehow combined to form a unitary contract." (second alteration in original) (quoting *Schonfeld* v. *Thompson,* 663 N.Y.S.2d 166, 167 (1st Dep't 1997))

Crucially, the SPA also contained a merger clause, stating that the SPA, "the [non-disclosure agreement between the parties], the other Transaction Documents, the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein contain the entire understanding of the parties solely with respect to the matters covered herein and therein" and that 22nd Century "has not, directly or indirectly, made any agreements with any Buyers relating to the terms or conditions of the transactions contemplated by the Transaction Documents except as set forth in the Transaction Documents." (Peizer Decl., Ex A at § 9(e)).[7] Similarly, the Consulting Agreement expressly incorporated the Warrants as part of the later transaction: "This agreement and the Warrants embody the complete agreement and understanding among the parties regarding the subject matter hereof and

---

[7] The Tranche 1A Warrant was not a "Transaction Document" as defined by the SPA. *See supra* note 2.

supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way." (Def. 56.1 Ex. C, at § 13). Courts have recognized that such merger clauses constitute "[t]he clearest evidence that a contract was intended to be an integrated contract." *Starter Corp.* v. *Converse, Inc.*, No. 95 Civ. 3678 (CSH), 1996 WL 706837, at *5 (S.D.N.Y. Dec. 3, 1996) (citing *Mfrs. Hanover Tr. Co.* v. *Yanakas,* 7 F.3d 310, 315 (2d Cir. 1993); *Invs. Ins. Co.* v. *Dorinco Reinsurance Co.*, 917 F.2d 100, 104 (2d Cir. 1990)).

Thus, because the SPA and Tranche 1A Warrant are not an integrated agreement, Crede's claim to rescind the SPA based on a breach of the Warrant fails as a matter of law.

## CONCLUSION

For the foregoing reasons, 22nd Century's Motion is GRANTED as to Count II and DENIED as to Counts III, IV, and V. The parties' case management plan is due on or before January 26, 2018.

SO ORDERED.

Dated:     December 28, 2017
           New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge